27 N.J. Super. 348 (1953)
99 A.2d 440
NATIONAL TILE BOARD CORPORATION, A CORPORATION OF NEW YORK, AND ROXDALE BUILDING PRODUCTS CORPORATION, A CORPORATION OF NEW YORK, PLAINTIFFS,
v.
PANELBOARD MANUFACTURING COMPANY, INC., A CORPORATION OF NEW JERSEY, IRVING RICHARD BENNETT, JEROME J. LESSER, JACK L. PARKER, EMILIO SPALLONE, SALVATORE PORTOLANO, JOHN SHALLO, AUGUSTUS PERRI, NORMAN FEDER, JOINTLY AND SEVERALLY, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided September 11, 1953.
*350 Messrs. Chazin & Chazin, attorneys for plaintiffs.
Messrs. Cole, Morrill & Nadell, attorneys for defendants.
GRIMSHAW, J.S.C.
The complaint in this cause is in three counts. In the first count it is alleged that the plaintiff is possessed of trade secrets, of which the defendants have knowledge, and that such knowledge was obtained by the defendants under circumstances which render it inequitable that they be permitted to use the trade secrets. Plaintiff seeks an injunction against further use by the defendants of the alleged trade secrets and an accounting of the profits realized as a result of such use. In the second count it is alleged that certain of the defendants conspired to obtain the trade secrets by fraud and use them for their own advantage. In the third count plaintiff charges that the individual defendants conspired to and did engage in sabotage of the products of the plaintiff with resultant damage of $100,000.
The third count was dismissed at the close of plaintiff's case because of a complete failure of proof, either of sabotage or damage. Plaintiff also failed to prove a conspiracy by the defendants as alleged in the second count. Therefore, if it is to succeed, plaintiff must do so on the first count.
*351 The plaintiffs National Tile Board Corporation and Roxdale Building Corporation were organized under the laws of the State of New York. They will hereafter be referred to as National and Roxdale. The defendant Panelboard Manufacturing Company is a corporation of the State of New Jersey, and will hereafter be referred to as Panelboard.
National and Panelboard are both engaged in the manufacture of tileboard. Until 1949 National manufactured and distributed its product. Since 1949 the sale of National's product has been in the hands of Roxdale, which is a wholly-owned subsidiary of National. Panelboard manufactures and distributes its own product.
The individual defendants were employed at one time by one or other of the plaintiffs. They are now employed by Panelboard. Panelboard was formed in May 1951 by Parker, Bennett and Lesser and commenced operations in November of 1951.
Tileboard is a masonite board, grooved in squares to resemble tile, and is painted and baked so that it has a hard finish. It is sold in 4 or 8 foot sheets. There are 20 manufacturers of tileboard throughout the United States. The products of the various manufacturers are so similar as to be practically indistinguishable one from the other.
The masonite boards are purchased from the owner of the patent. They are then trimmed in order to make the edges even. The machine with which this cutting or trimming is accomplished is called a "trimmer." After the boards are trimmed they are placed in a machine called a "knifer," which applies paint evenly over the board. The board is then placed in a scoring machine which grooves it. Then it goes to the "striper," which applies different colored paint to the grooves. The trimmer, knifer, scorer and striper are the machines of which plaintiff claims the exclusive use as trade secrets.
A trade secret is a formula, pattern, device or compilation of information which is used in one's business and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. 4 Restatement, Torts, *352 sec. 757. A trade secret must have a substantial element of secrecy. While it need not be patentable, it must contain elements which are unique and not generally known or used in the trade. And its possession must give its possessor an economic advantage over competitors.
Plaintiff lists as its trade secrets, in addition to its machinery, its list of customers, its advertising and its business methods. All of these alleged trade secrets plaintiff says were pirated by the defendants.
I am unable to understand what feature of plaintiff's business methods is a trade secret. Mr. Hirsch, president of National, testified that plaintiff's practice of soliciting orders from retailers as well as wholesalers was his idea, and as such was a trade secret, entitled to protection. However, the solicitation was accomplished not only by mail and personal visitation but also by advertisements in large metropolitan dailies and trade papers. Obviously, therefore, such a business method could not be regarded as a trade secret.
I am also unable to understand what there is about advertising which could be regarded as a secret. Such a suggestion seems absurd. The advertisements of plaintiff and defendant Panelboard are completely dissimilar. There is no attempt on the part of Panelboard to seek to deceive the public and cause them to believe that the Panelboard product is that of the plaintiff. On the contrary, defendant makes every effort by its publicity to differentiate its product from that of others and proclaim its excellence. On that score, therefore, plaintiff has no ground for complaint. Ferber Corp. v. Northern Industrial Products, Inc., 15 N.J. Super. 283 (Ch. Div. 1951), affirmed 18 N.J. Super. 493 (App. Div. 1952).
Plaintiff complains that defendants have stolen its customers. It is conceded that when the defendant Parker left plaintiff's employ he had a list of its customers which had been compiled by him during the course of his employment. And it is also conceded that the customers whose names appeared on that list were among those whose trade was solicited by the defendant. However, neither Parker nor *353 any of the other defendants was a party to a contract, express or implied, which prohibited him from selling to customers of his late employer. And the general rule is that such solicitation of business is not objectionable. The plaintiff is a manufacturer dealing with jobbers and retailers. The knowledge of the names of its customers is not a trade secret. Haut v. Rossbach, 128 N.J. Eq. 77 (Ch. 1940), affirmed 128 N.J. Eq. 478 (E. & A. 1940); Abalene Exterminating Co. of N.J. v. Elges, 137 N.J. Eq. 1 (Ch. 1945).
There is then the problem as to whether the machinery used by the plaintiff may be considered to be a trade secret, and, if so, was it copied and used improperly by the defendants? On that phase of the case a great amount of testimony was given, chiefly by Mr. Hirsch, president of National, and Mr. Pisani, its executive manager. Their testimony was not convincing. Some of the claims which they made approached the ridiculous. Apparently they were under the impression that everything used in their shop was a trade secret. As a result, they did not make impressive witnesses.
Plaintiff National started manufacturing tileboard in 1939. At the outset it had considerable difficulty producing an acceptable board. Changes in the machinery were made from time to time. Hirsch and Pisani testified that the changes were the result of exhaustive research carried on over a period of years at an expense of upwards of $100,000. Beyond that bald statement, however, no proof of its accuracy was forthcoming.
Early in 1940 Hirsch engaged the services of one Fraioli, who runs a general machine shop and builds specialized machines. Fraioli spent some time in the plant of the plaintiff, observing the operation of the machines and making changes in them. Then at the request of Hirsch he built several scorers and trimmers. Hirsch testified that the machines built by Fraioli were constructed wholly from plans and specifications furnished by Hirsch under a pledge of secrecy. This testimony is denied by Fraioli. He says that all he received from Hirsch was an order to build the machines. He designed and built the machines himself. He *354 said that they contain neither novel nor patentable features and consist of ordinary combinations of elements well known to all machinists. He laughed at the suggestion that the machines were original in design and remarked that had they been, he would have patented them himself. He also denied that there was any suggestion from Hirsch or anyone else that the design of the machinery should be kept secret.
The knifer and striper used by the plaintiff were built by the defendant Portolano, who was maintenance man in plaintiff's factory. They were the result of improvements and corrections made on old machines which had been in use for some time in plaintiff's plant and one or more of which had been purchased by the plaintiff at a sale of the equipment of a tileboard company which had suspended operation. Portolano testified that none of the machines built by him contained any novel or patentable ideas.
The defendant Parker was hired as a sales manager by the plaintiff in 1948 and was discharged in 1951. Bennett became associated with the plaintiff company as advertising manager in 1948 and was discharged in 1951. Perri joined National as a laborer in 1945, rose to the position of foreman and later shipping clerk and was discharged in 1952. Lesser was hired as office and credit manager by National in 1948 and was discharged in 1951. Portolano was hired as maintenance man in 1947 and resigned in 1951. Spallone originally was hired as a laborer and later became a foreman. He resigned in 1951. Shallo was hired as a production foreman in 1947 and was discharged in 1950. Feder was hired as a salesman in 1951 and resigned in 1952.
The formation of Panelboard by Parker, Bennett and Lesser occurred shortly before their discharge by the plaintiff. The other defendants later joined that organization. So far as the record shows, the charge by National that any of these men was lured from its employ by Panelboard is utterly without foundation. On the contrary, it is clear that they were either discharged or resigned because of what they regarded as intolerable working conditions.
*355 Following the organization of Panelboard, Fraioli was engaged to build a trimmer and a scorer for that company. No plans or specifications were given to him nor was he requested to copy the machines used by the plaintiff. The only direction given to Fraioli was that the machines should be built as cheaply as possible. The result was, according to Fraioli, that he built two machines similar in many respects to some of the older models made by him for the plaintiff but inferior in quality to those now used by National.
Similarly, when Portolano joined Panelboard he was requested to build a knifer and a scorer, which he did. These machines also are in many respects like those used by the plaintiff. It is the use of these machines and those built by Fraioli which the plaintiff seeks to restrain.
It is well settled that a manufacturer whose goods are made by an unpatented secret process is entitled to protection by injunction against the divulging of his secret in a proper case. Employees of one having a trade secret "who are under an express contract, or a contract implied from their confidential relation to their employer, not to disclose that secret, will be enjoined from divulging the same to the injury of their employer, whether before or after they have left his employ; and that other persons, who induce the employe to disclose the secret, knowing of his contract not to disclose the same, or knowing that his disclosure is in violation of the confidence reposed in him by his employer, will be enjoined from making any use of the information so obtained." Stone v. Goss (Grasselli Chemical Co.), 65 N.J. Eq. 756 (E. & A. 1903).
On the other hand, an employee is not compelled to shut his eyes to what goes on in his place of employment nor is he required to wipe his memory clear of those matters which he learns during the course of that employment. So long as no contract express or implied prohibits him from divulging the information learned during his employment, the *356 employee may use that information for his own benefit. Carver v. Harr, 132 N.J. Eq. 207 (Ch. 1942); Boost Co. v. Faunce, 13 N.J. Super. 63 (Ch. Div. 1951), affirmed 17 N.J. Super. 458 (App. Div. 1952).
"Sound public policy encourages employes to seek better jobs from other employers or to go into business for themselves. Contracts which hinder their so doing are strictly construed and rigidly scanned and are declared void unless necessary for the reasonable protection of the employer. In the absence of agreement, as the decisions above cited demonstrate, there must be a very strong case before the court will restrain the former employe from competing with his former employer." Haut v. Rossbach, supra.
None of the defendants had an employment contract. Their positions were not in a class which could be characterized as confidential. Hirsch and Pisani testified that the defendants were shown and used the machines under a pledge of secrecy. This is denied by the defendants. I am inclined to believe them. All of plaintiff's employees, regardless of the nature of their jobs, were given the run of the factory and were permitted and even requested to observe the operation of the machinery. While there was some testimony concerning restrictions on the entry of outsiders to the factory, the evidence is conflicting as to the extent to which the restrictions were enforced, and from the testimony I received the impression that such regulations were promulgated in the interest of efficient production rather than secrecy.
Although plaintiff objects to the use by Panelboard of the machines built by Fraioli, it seeks no relief against him. I am satisfied that Fraioli was under no obligation to keep secret the machines which he built for the plaintiff. He was in the business of building specialized machinery, and in the absence of contractual obligations to the contrary, of which there is no evidence, he could build similar machines for others. King v. Gannon, 291 Mass. 94, 158 N.E. 346 (Mass. 1927). And there was no reason why defendants should not employ him to build machines for them.
So, too, with Portolano. He was under no obligation to keep secret from his present employer the knowledge which *357 he had gained in the employ of the plaintiff. As to the machines themselves, the evidence is overwhelming that the elements of which they were constituted have long been known in the machinery business and are available on the open market. One of the plaintiff's witnesses, an expert, testified that one element of plaintiff's machine possessed novelty but the bulk of the testimony was to the contrary. I am satisfied that any competent machinist could duplicate the machines.
The record is bare of credible proof that plaintiff's machines are secret or that their possession gives to the plaintiff an advantage over its competitors either in the quality of the product or the cost of production. Neither Hirsch nor Pisani had ever been in the plant of a competitor. They knew nothing of the methods used by others. For all we know, all other manufacturers may be using machines identical with those possessed by the plaintiff. There was no testimony concerning costs of production. And, as to the quality of merchandise, the evidence indicates that the products of all of the manufacturers in the tileboard business are practically indistinguishable one from the other. Even Mr. Hirsch, an expert in the manufacture of tileboard, upon being shown samples of products produced by various manufacturers, was in some instances unable to distinguish his own product from that of other companies.
As was observed by Judge Jayne in Abalene Exterminating Co. of N.J. v. Elges, supra:
"Here, there was no peculiarly confidential relation between the parties. No trade secret is involved. No fraud is being practiced. No misrepresentations are being made. The complainants are vexed because the employee voluntarily relinquished his employment in the hope of improving his own fortunes by conducting a similar business. He is merely carrying into his new venture the knowledge and experience that he scrupulously acquired in the old. If the future is to be erected upon the experiences of the past, then emulation is the beginning point of progress. Progress is not to be confined to the discovery of a new enterprise. It may well be a more advantageous and efficient extension of an old one."
*358 And, again:
"In the contraction of business opportunities, the right of the energetic individual to honorably compete is more than ever indispensable to his right to prosper and excel. If an employer is apprehensive of the prospective honest competition of his employees, let him obtain from them a restraining covenant ancillary to their contracts of employment."
For the reasons expressed above, there will be judgment for the defendants.