63 N.J. Super. 517 (1959)
164 A.2d 824
UNITED BOARD & CARTON CORPORATION, A CORPORATION OF NEW JERSEY, PLAINTIFF,
v.
WILLIAM J. BRITTING, HOWARD V. BRITTING, ET AL., DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided August 3, 1959.
Affirmed May 12, 1960.
*518 Mr. Isadore Glauberman, attorney for plaintiff.
Mr. James A. Major argued the cause for defendants (Messrs. Rosenberg, Schmidt & Greenhalgh, attorneys).
Affirmed May 12, 1960, in 61 N.J. Super. 340.
KILKENNY, J.S.C.
Plaintiff sued to restrain the individual defendants, its former employees, and the corporate *519 defendant created by some of them, from soliciting from and doing business with those old customers of plaintiff, to whom the individual defendants had sold plaintiff's corrugated paper products, while they were in plaintiff's employ. In addition to a demand for an accounting, plaintiff also sought to compel the defendants to return to plaintiff's possession a large number of dies used in stamping customers' names on products manufactured by plaintiff for these customers, which dies the defendants had caused to be removed, without authority, from plaintiff's premises, in violation of its general property rights as owner of some of these dies, or its special property right therein as bailee of its customers.
The basis of the complaint was that the individual defendants, who had been employed for many years in making sales of plaintiff's corrugated paper products, as well as in selling for Densen Banner Company, Inc., from whom plaintiff acquired this corrugated paper business on January 1, 1954, had, while still in plaintiff's employ, and for several months prior to the termination of their employment relation with plaintiff, set up their own rival corporation in September 1958, in competition with the plaintiff, their employer, and had pirated a substantial part of plaintiff's corrugated business. And then, when they had wrongfully and by dishonorable methods enticed away many of plaintiff's best customers and had surreptitiously removed the customers' dies, all in violation of their duty of loyalty to their employer the plaintiff, the individual defendants resigned en masse in March 1959, a "target date" previously agreed upon by them. Thus, the plaintiff, having paid $3,998,000 to Densen Banner Co., as of January 1, 1954, for all the assets of this corrugated paper business  which price included about $1,700,000 in cash and bonds  found itself, without forewarning, bereft of its key sales personnel, with many of its principal customers stolen away by its trusted sales representatives while they were still employed by plaintiff, and with the dies of these customers covertly removed *520 from plaintiff's plant without the permission or knowledge of any officer of the plaintiff.
Based upon the pleadings, depositions, exhibits and testimony taken in open court, including the frank admissions of defendants under oath in their depositions, and in the testimony before the court by the defendant William J. Britting  the only defendant to testify at the court hearing  that the defendants had engaged in the double-dealing and divided loyalty charged against them, while still on plaintiff's payroll, a preliminary injunction was ordered.
As indicated in the order allowing the preliminary injunction, the court found from the evidence that the defendants William J. Britting, Howard V. Britting and Alexander A. Gaffney, while in the employ of the plaintiff, secretly incorporated a competing company, Carton Sales, Incorporated, about six months before their leaving the employment of the plaintiff; secretly diverted to the said Carton Sales, Incorporated, a large part of the business of the plaintiff; and lulled the plaintiff, during all this time, by also allowing a flow of some business of the same customers to plaintiff. It was found that they utilized their trusted position wrongfully to remove from the plaintiff's premises customers' dies, in which the plaintiff had general or special property rights. While employed and drawing compensation from the plaintiff, the individual defendants also worked in competition for the defendant Carton Sales, Incorporated. During the same period the main defendants, William J. Britting, Howard V. Britting and Gaffney, induced the other defendants, Morton H. Mass, William J. Keegan and Bruce L. Kirchenheiter, to divert business from the plaintiff to the defendant Carton Sales, Incorporated, while these defendants were also employed by plaintiff. The evidence further established that the said individual defendants, during the said period, conspired to keep their activities secret from plaintiff; that the said activities constituted acts of disloyalty to their employer, the plaintiff herein; that they formed a conspiracy through wrongful and improper *521 means to divert the plaintiff's customers to the defendant Carton Sales, Incorporated, and injure the plaintiff in its corrugated box business; and that they used confidential information gained by them, while in the employ of the plaintiff, in a wrongful and unfair competition with the plaintiff, all in violation of the duties they owed to the plaintiff. It further appeared to the court that unless a preliminary injunction was granted as prayed for in the complaint, irreparable loss, injury and damage would result to the plaintiff.
Therefore, it was ordered that the defendants, pending a final hearing, be and they are enjoined and restrained from continuing, directly or indirectly, from doing business with any customers of the plaintiff corporation as they appear on a certain list of plaintiff's customers, marked in evidence as Exhibit P-13, and from soliciting, directly or indirectly, any business from such customers, and from continuing in their possession or using any dies which were removed from the plaintiff's premises and for which written permission was not expressly given by former customers of the plaintiff; and that the defendants return forthwith to the plaintiff's premises all dies removed from the plaintiff's premises by the defendants or their agents, for which written permission was not expressly given by the former customers of the plaintiff.
While the defendants' attorney has petitioned the Appellate Division for leave to appeal the order granting the preliminary injunction, and has obtained until August 10, 1959 an ex parte ad interim stay of this injunction from a single judge temporarily assigned to the Appellate Division, both sides have, in writing, stipulated that the trial court shall render final judgment as to the injunctive phase of this case on the basis of the present proofs, and have waived further evidence or testimony, except as to the reserved issues of the accounting and other incidental relief, and the counterclaim, to be brought on for hearing in due course.
*522 Accordingly, I have reviewed the entire matter and conclude that the proofs require the same findings as those set forth above, which furnished the basis for the preliminary injunction. I am, therefore, granting a final judgment in favor of the plaintiff and against all the defendants, enjoining them in the same manner and to the same extent as set forth in the preliminary injunction. However, where that order provided a temporary injunction pending final hearing, the injunctive order in the final judgment will be made effective for a period of two years from the date of the final judgment. Any time during which this injunctive order may be stayed, as the result of any appeal therefrom, shall not be counted as part of this two-year period. I have decided upon this limited time of two years, as against the contention of plaintiff's attorney that the defendants ought to be enjoined permanently, or for a longer period than two years. Likewise, for the reasons hereinafter set forth, and against the contention of defense counsel, I feel that there is no adequate remedy at law by a mere award of money damages for the obvious acts of disloyalty by the defendants while they were still in plaintiff's employ, so that some measure of injunctive relief is necessary to give the plaintiff a fair and equal opportunity in the competition between it and its disloyal former employees to obtain the business involved.
At the outset, we should make clear that no restrictive covenant is involved. Cases such as Abalene Exterminating Co., Inc. v. Oser, 125 N.J. Eq. 329 (Ch. 1939); Arthur Murray Dance Studios of Cleveland v. Witter, 105 N.E.2d 685, 62 Ohio Law Abst. 17 (Ohio C.P. 1952); Mandeville v. Harman, 42 N.J. Eq. 185 (Ch. 1886); and Golden Cruller & Doughnut Co. v. Manasher, 95 N.J. Eq. 537 (Ch. 1924), dealing with the validity and enforceability of restrictive covenants made by employees as part of their contract of hiring, are not applicable herein. There were no written contracts of employment between these parties. The hiring was oral and without any fixed term of employment. *523 The individual defendants had the right to terminate their employment, or the plaintiff could have legally ended their employment, at any time. But there was an employer-employee relationship on a full-time, exclusive basis between the plaintiff and each of the individual defendants, with a minor indulgence as to the defendant Gaffney. The defendant William J. Britting, an employee of many years standing, who acted in a supervisory capacity without special title and who sold and serviced some customers, received a salary of $19,000 per year, without commissions. The other employees were generally on a commission basis, with drawing accounts, working only for the plaintiff and for no competitor of plaintiff, so far as it knew. Gaffney was specially permitted to sell and service his own one isolated account in Illinois, because it was beyond the area of plaintiff's operations. But Gaffney's employment by plaintiff yielded him about $25,000 per annum. His tolerated other effort brought him a relatively small sum per year. Though some of the defendants worked as salesmen on a commission basis only, they were clearly employees obligated to sell for plaintiff only, and not free-lance salesmen or independent contractors, except in the one instance where Gaffney was given special dispensation.
Likewise, we are not concerned here with the established rule of law which allows a former employee, not bound by a restrictive covenant and not guilty of any breach of trust, after the termination of his employment, to compete honestly with his former employer, even to the extent of soliciting the customers of his former employer with whom he became acquainted in the course of his employment. For a clear statement of this legal principle and the reasons underlying it, see Haut v. Rossbach, 128 N.J. Eq. 77 (Ch. 1940); National Tile Board Corp. v. Panelboard Mfg. Co., 27 N.J. Super. 348 (Ch. Div. 1953); Abalene Exterminating Company of New Jersey, Inc. v. Elges, 137 N.J. Eq. 1 (Ch. 1945); 23 A.L.R. 423; 126 A.L.R. 758; 35 Am. Jur., Master and Servant, § 100, p. 529; Restatement, Agency, *524 § 396 (a) and (b), and comments thereunder; Boost Co. v. Faunce, 17 N.J. Super. 458 (App. Div. 1952); Newark Cleaning & Dye Works v. Gross, 97 N.J. Eq. 406 (Ch. 1925).
In each of these cases the former employees entered into competition with their old employer, in an honest and legitimate manner, after severance of the employment relation. In the instant case the former employees acted in a disloyal and dishonorable competition with their employer, while they were still employed by it.
Also, an employee not bound by covenant, and absent any breach of trust, may anticipate the future termination of his employment and, while still employed, make arrangements for some new employment by a competitor, or the establishment of his own business in competition with his employer. However, he may not solicit his employer's customers for his own benefit before he has terminated his employment. This would constitute a breach of the undivided loyalty which the employee owes to his employer while he is still employed.
In section 393 of the Restatement, Agency the rule is thus stated:
"Unless otherwise agreed, an agent is subject to a duty not to compete with the principal concerning the subject matter of the agency."
Under comment (e), section 393, it is declared that he may, "before the termination of the agency, make arrangements to do so. * * * He may not, however, before the termination of his employment, solicit customers for such rival business, nor may he do other similar acts in direct competition with the employer's business." (Emphasis supplied)
The evidence in this case showed more than merely making preparations for the establishment in futuro by defendants of a competitive business to become operative upon severance of their employee relationship. The pattern of their conduct for the six months' period preceding their mass resignation *525 reveals a deliberately planned conspiracy to capture their employer's valuable corrugated box business and the surreptitious furtherance of their plot, as set forth in the findings above.
Our courts have been careful to distinguish between former employees "honestly" competing with the old employer for the latter's customers and the "pirating" of the former employer's business by dishonorable and disloyal means. Thus, in Newark Cleaning & Dye Works v. Gross, supra, it was succinctly stated:
"There are cases where courts have interfered to protect against former employees pirating customers. * * * The distinction lies between pirating and competing for customers."
In the Abalene Exterminating Company of New Jersey, Inc. v. Elges case, supra, the court stated the same principle and remarked "Let it be at once understood that * * * instances of fraudulent practices and infringements are not within the scope of this memorandum." [137 N.J. Eq. 1.]
To the same effect and with the same substantial language used, see Abalene Exterminating Company of New Jersey, Inc. v. Elges, supra, and Lewitter v. Adler, 101 N.J. Eq. 74 (Ch. 1927), in which the court said:
"The law distinguishes between an employee pirating his employer's trade by fraudulent means, and honestly competing with him for it, and the authorities * * * discriminated between lawful and unlawful conduct."
Section 393 of the Restatement, Agency confirms the agent's duty of loyalty to his principal. It has been followed by many case decisions throughout the country. Ritterpusch v. Lithographic Plate Service, 208 Md. 592, 119 A.2d 392, 397 (Md. Ct. App. 1956), a case very comparable to the instant case, held that the duty of fidelity and loyalty, which an employee owes to his employer, does not prevent the employee from making preparations for future competition with the employer, either in business alone or with others, *526 but the employee may not go so far as to solicit business of customers of the employer before termination of employment relations, because "the obligation to protect his master's interests lasts until the last hour of his service." "He may plan and prepare * * * but his duty forbids him, during the agency, to ask his principal's customers to transfer their custom, even though the transfer is not to take effect until after the agency ceases." (Emphasis added)
In Duane Jones Co. v. Burke, 306 N.Y. 172, 117 N.E.2d 237 (1954), another case similar on its facts, the New York Court of Appeals upheld a very large verdict "because the appellants had violated their obligations of loyalty to their employer by competing while still employees." Citing numerous cases in accord.
An agent cannot be allowed to take the benefit of a transaction, the entering into which was in violation of his duty. As stated in 54 Colum. L. Rev. 994-5:
"No case, however, has permitted the employee to make a direct offer to his employer's customers, while still on the payroll."
See, too, 38 Minn. L. Rev. 661, 663, and the cases of Singletary v. Mann, 157 Fla. 37, 24 So.2d 718, 166 A.L.R. 904 (Fla. Sup. Ct. 1946); Swaney v. Clark-Wilcox Co., 331 Mass. 471, 120 N.E.2d 281 (Mass. Sup. Jud. Ct. 1954); Van Woy v. Willis, 153 Fla. 189, 14 So.2d 185 (Fla. Sup. Ct. 1943); Walsh v. Atlantic Research Associates, 321 Mass. 57, 71 N.E.2d 580 (Mass. Sup. Jud. Ct. 1947).
Witmer v. Arkansas Dailies, 202 Ark. 470, 151 S.W.2d 971 (Ark. Sup. Ct. 1941), held that "during the period of his employment, an employee must be loyal to his employer and must not attempt to set up a competitive business."
In Boylston Coal Co. v. Rautenbush, 237 Ill. App. 550, 559 (App. Ct. 1925), the court found "that the evidence quite overwhelmingly shows that the defendants undertook to obtain the very essence of the complainant's business by *527 unfair means." That language aptly describes the defendants' conduct in this case.
In Colonial Laundries v. Henry, 48 R.I. 332, 138 A. 47, at page 50, 54 A.L.R. 343 (R.I. Sup. Ct. 1927), the court, using the reason of "unfair competition" in enjoining former employees from using lists of laundry customers in their solicitation, stated
"It is not the breach of express contractual relations which equity is attempting to stop; it is a breach of trust often referred to as a contract implied in law. * * * It is the misuse of special confidential knowledge secured while the contractual relation existed." (Emphasis added)
John Davis & Co. v. Miller, 104 Wash. 444, 177 P. 323 (Wash. Sup. Ct. 1918), refers to Boosing v. Dorman, 210 N.Y. 529, 103 N.E. 1121 (Ct. App. 1913), affirming the Appellate Division's holding (148 App. Div. 824, 133 N.Y.S. 910 (1912)) that the defendant would not be "perpetually" restrained from soliciting customers of his former employer. The question of the duration for which an injunction might properly issue was referred back to the trial court.
In French Bros. Bauer Co. v. Townsend Bros. Milk Co., 21 Ohio App. 177, 152 N.E. 675 (Ohio Ct. App. 1925), an injunction was allowed for a period of one year restraining defendant from hiring plaintiff's former employees, because of the conspiracy by which the old employees were enticed away. Unfair competition was the reason for the injunction.
As stated in George v. Burdusis, 21 Cal.2d 153, 130 P.2d 399, 403 (Cal. Sup. Ct. 1942):
"It `is not merely the knowledge of the identity of the customers, but the friendly contact with them, which is important to the solicitors * * *.' Their personal acquaintance with customers and knowledge of `their respective places of residence, their peculiar likes and fancies and other characteristics, a knowledge of which would greatly aid them in securing and retaining the business of said former customers,' is sufficient to invoke equitable protection against the subsequent use by a former employee of such information."
*528 In Lind v. Carson and Howard, 16 Ill. App.2d 542, 148 N.E.2d 814 (App. Ct. 1958), a suit against plaintiffs' former employees, the evidence established that defendants, while employees of plaintiff, conspired with each other and fraudulently took over customers of plaintiffs and undertook to obtain the essence of plaintiffs' exterminating business. It was held that an order enjoining defendants from soliciting and servicing for themselves plaintiffs' customers, who were customers as of the date on which plaintiffs discharged defendants, or in anywise doing any exterminating work for such customers, was justified. Not only were temporary and permanent injunctions ordered, but it was also held that equity will not permit an agent who has profited from violating a relationship of trust and confidence to retain his gains, but will compel him to turn over the gains to one equitably entitled thereto.
Matzen v. Horwitz, 102 Cal. App.2d 884, 228 P.2d 841 (Cal. D. Ct. App.) stated that:
"In every contract there is an implied covenant of good faith and fair dealing and that neither contracting party will do anything to destroy or injure the rights and interests of the other party."
It also expressed the rule that an employee, in the absence of contractual inhibition, may enter into competition with his former employer and solicit his customers, "provided such competition is fair and legally conducted."
Messenger Pub. Co. v. Mokstad, 257 Ill. App. 161 (App. Ct. 1930) involved an action based on defendant, a competitor, having induced away some of plaintiff's travelling salesmen, who gave defendant plaintiff's lists of customers  injunction was allowed "until the end of the year 1928," about one year from the grant of preliminary relief, restraining the salesmen from conspiring with plaintiff's business rival or from using the information given to defendant.
In Morgan's Home Equipment Corp. v. Martucci, 390 Pa. 618, 136 A.2d 838 (Pa. Sup. Ct. 1957), the court stressed that the inducing of employees to leave present employment *529 and take work with another is unlawful, when the purpose of enticement is to cripple and destroy an integral part of a competitive business organization.
In Morrison v. Woodbury, 105 Kan. 617, 185 P. 735 (Kan. Sup. Ct. 1919), an injunction was allowed against a former employee not only to restrain his divulging trade secrets, but also compelling him to return certain books, the property of plaintiff.
United States v. Proctor & Gamble Co., 47 F. Supp. 676, 678 (D.C.D. Mass. 1942), stating the rule as to the duty of loyalty of an employee as to confidential information, denounces the breach of that duty as partaking of the quality of fraud, when the employee proceeds in a surreptitious or deceptive manner.
In A.S. Rampell, Inc. v. Hyster Company, 3 N.Y.2d 369, 165 N.Y.S.2d 475, at page 482, 144 N.E.2d 371, at pages 376-377 (Ct. App. 1957), where plaintiff's salesman had negotiated for a dealership in competition with the plaintiff and had induced plaintiff's employees to leave their employment, the court said:
"These actions on his part were not, as claimed, merely planning for new employment after leaving plaintiff's employ; they were acts committed on the time of his employer, and intended to interfere with then existing agreements between his employer and other employees * * * and participation in a plan deliberately designed to destroy his employer's business."
In Town & Country House & Home Service, Inc. v. Newbery, 3 N.Y.2d 554, 170 N.Y.S.2d 328, 147 N.E.2d 724 (1958), the Court of Appeals affirmed an injunction restraining defendants, former employees, from dealing with plaintiff's customers. There, too, while in plaintiff's employ, they conspired to terminate their employment, form a business of their own in competition with plaintiff and solicit plaintiff's customers for their business. There, also, they terminated their employment virtually en masse. All this conduct was held to be violative of their obligations and injunctive relief was granted.
*530 It seems clear, therefore, that where former employees, in violation of the duty owed to their employer, have gone into secret competition with him, while still enjoying his trust and the benefits of their employment, the courts have generally required these disloyal employees to answer for their treachery. In some of the cited cases, the injured employer has sued for and recovered damages, or has sought and obtained an accounting by the faithless employee. In other instances, the court granted temporary and final injunctive relief.
If the defendants in this case had waited until the termination of their employment before entering into honest competition with the plaintiff, by fairly soliciting the plaintiff's customers, including those to whom they had previously sold the plaintiff's products, they would have been within their legal rights in so competing and so soliciting. This would also be true, even if, in addition to the foregoing, they had, while in plaintiff's employ, merely "made arrangements" to set up their new competitive venture to become operative upon the termination of their employment. But, instead of doing the legally right and honorable thing, they conspired on the very time for which they were being paid by their employer and in the course of the performance of their duties to steal away for their own personal benefit their employer's customers. On September 1, 1958, defendant William J. Britting, who had been receiving a salary of $19,000, requested a $6,000 raise to $25,000, and was informed that a decision would be made by October 1, 1958. Instead of waiting, he set up the rival corporation on September 25, 1958. It is fair to infer that he made the demand extravagantly to furnish an excuse for his later quitting. They entered into direct, secret, and unfair competition with their employer, while they were still in its employ. Under the circumstances, it was easy for them to pirate their employer's business. Each had an assigned list of the plaintiff's customers, upon whom the assigned defendant alone called for sales or service.
*531 While charged by law and common decency to advance the employer's welfare, so long as they were being paid by it for their services, they conspired and acted treacherously to destroy the plaintiff's business and to seize it for themselves and their own competitive corporation. They conducted a campaign among the customers disparaging plaintiff's products, which each of them had sold exclusively to these same customers for many years. Boxes with 38-pound liners, instead of 42-pound liners, as required by I.C.C. regulations, had been sold by these defendants for years to the same customers, in accordance with a generally accepted trade custom to meet cut-throat competition, without any substantial complaints. Armed with this half-truth, which they themselves had known of for a long time, they set out to convince the customers that they were being cheated by their employer. Presumably, William J. Britting would have conveniently forgotten the 38-pound liners, if his salary request of $25,000 had been granted. They did not give the employer even a sporting chance to explain or defend itself. They pictured their own employer as a fraud and a cheat and made representations that if an order was placed with Carton Sales, the customer would get what he ordered. How they squared themselves with the customers, from whom they had procured orders for years, with full knowledge of the facts, is left to conjecture.
These defendants, possessed of the confidential price lists of their employer, the plaintiff, were able to direct the flow of business to or away from the plaintiff, depending on whether they could give better price quotations to the customers by jobbing the sale through their own corporation to a manufacturer who was in competition with their own employer. When the court asked the defendant William J. Britting how they determined, during the period between September 1958 and March 1959 whether the customer's business would be allocated to their employer or to themselves, he freely admitted that it depended generally on whether they could equal or better their employer's price. *532 Was this "heads-I-win, tails-you-lose" policy of defendants, trusted employees for many years, with confidential price lists and intimate knowledge of plaintiff's products, including their limitations, "honest" competition, especially at a time when the plaintiff had no other salesman meeting these customers to offset this "knife in the back" conduct? The net result of their disloyalty is evidenced by the figures in the case. Between September 1958 and March 15, 1959, these defendants turned into plaintiff in orders from old customers $196,093.31, while, during the same period, they had diverted orders from customers of their employer to their own corporation in the sum of $121,958.56. Thus, during this 6-month period of double dealing they took away a substantial part of their employer's business. Remember, too, as the evidence demonstrates, that during this time, in the competition between themselves and their employer for the business of the employer's customers, they were the sole spokesmen for themselves and, at the same time, the sole representatives of their employer with these same customers. Obviously, on that basis, they could have misappropriated at least 90 per cent of their employer's business. The apparent reason why they did not do so was their deliberately conceived plan of concealing their treachery from their employer before their established "target date" of March 1959. Thus, they "jumped the gun" in the competitive race six months before the plaintiff knew it was in a race with trusted employees of many years' standing. We know that they propagandized the customers for six months and told them that their employer had been defrauding them. Whether they used other means of disparaging plaintiff's products, we do not know.
It might be contended that these defendants are answerable in money damages and can be required to account to their employer for their ill-gotten gains, or the profits which the plaintiff would have made but for the disloyalty of the defendants. There is no doubt that they are liable in damages for their breach of the duty of loyalty owed by *533 an agent to his principal. Sections 393 and 394, Restatement, Agency, and comments thereunder. Some of the many cases so holding are: Irving Iron Works v. Kerlow Steel Flooring Co., 103 N.J. Eq. 240 (Ch. 1926); F.A. Bartlett Tree Expert Co. v. Hartney, 308 Mass. 407, 32 N.E.2d 237 (Mass. Sup. Jud. Ct. 1941); Matzen v. Horwitz, 102 Cal. App.2d 884, 228 P.2d 841 (Cal. D. Ct. App. 1951); Raymond Farmers Elevator Co. v. American Surety Co. of New York, 207 Minn. 117, 290 N.W. 231, 126 A.L.R. 1351 (Minn. Sup. Ct. 1940); Ritterpusch v. Lithographic Plate Service; Duane Jones Co. v. Burke; Van Woy v. Willis; Walsh v. Atlantic Research Associates, all supra.
But, is the remedy by way of money damages adequate here? I think not. Any computation of money damages at this time cannot be made with any degree of reasonable certainty. Who can calculate the amount of future profits lost by reason of the wrongful taking away of plaintiff's customers? It is a well established rule that equity will intervene to grant equitable relief when the damages at law are inadequate, or not readily calculable.
"The remedy is considered by equity to be inadequate * * * if the probable injury is of such a nature that the damages cannot be ascertained with reasonable accuracy."
McClintock, Handbook of Equity (1936), sec. 41, p. 63. Feigenspan v. Nizolek, 71 N.J. Eq. 382 (Ch. 1906).
See, too, Boyce's Ex'rs v. Grundy, 3 Pet. 210, 28 U.S. 210, 7 L.Ed. 655 (1930), in which the United States Supreme Court said:
"It is not enough that there is a remedy at law. It must be plain and adequate, or, in other words, as practical and efficient to the ends of justice and its prompt administration as the remedy in equity."
It is going to take the plaintiff a reasonable amount of time to put new salesmen in the field, in place of the defendants who have been its sole sales representatives for *534 years, to confer with these customers. It will take these new men a fair amount of time, certainly more time than the six or more months employed by defendants to destroy the plaintiff's corrugated paper business, to discover, if possible, what sales talk, true or false, was used by the defendants to decimate plaintiff's corrugated business, for which it paid millions of dollars only five years ago, to equalize the competitive race. The defendants should not be kept out of competition forever, for such a policy would destroy free enterprise and the wholesome benefits which fair and honest competition creates. Their need to earn a livelihood is no excuse or justification for stealing their employer's customers. So, I have concluded that if defendants are restrained for a limited period of two years from soliciting or doing business with those customers whom they sold, while working for the plaintiff, a proper, equitable solution of defendants' wrong will be reached. It shall be so ordered.