691 A.2d 876

SUBCARRIER COMMUNICATIONS, INC., A NEW JERSEY CORPO-
RATION, PLAINTIFF–RESPONDENT, v. DONA L. DAY, DAY-
COMM, INC., A NEW JERSEY CORPORATION, AND SYTEX,
INC., A NEW JERSEY CORPORATION, DEFENDANTS–APPEL-
LANTS.

Superior Court of New Jersey
Appellate Division

Argued February 25, 1997—Decided April 16, 1997.

Before Judges DREIER, D'ANNUNZIO and VILLANUEVA.

*David B. Katz* argued the cause for appellants Dona L. Day and Daycomm, Inc.

*Thomas F. Quinn* argued the cause for appellant Sytex, Inc. (*Wilson, Elser, Moskowitz, Edelman & Dicker*, attorneys; *Mr. Quinn*, of counsel and on the brief; *Ann Schmidtberger Pagano* on the brief).

*Gregory R. Milne* argued the cause for respondent (*Cassidy, Foss & San Filippo*, attorneys; *Mr. Milne*, on the brief).

The opinion of the court was delivered by

DREIER, P.J.A.D.

Defendants, Dona L. Day, Daycomm, Inc. and Sytex, Inc., appeal by leave granted from a preliminary injunction which, *inter alia*, prohibited them from dealing with specific customers of plaintiff, Subcarrier Communications, Inc.[1] The order was entered after defendant Day terminated her employment as Vice President of plaintiff; formed her own company, defendant Daycomm, Inc.; and then became employed by defendant Sytex, Inc. The order also granted plaintiff the relief of enjoining defendants from disclosing plaintiff's allegedly confidential information. Further, the order required defendants to return plaintiff's property and provide a monthly accounting. Pending our hearing of this appeal, we stayed the portion of the preliminary injunction prohibiting defendants from soliciting business from, or doing business with, the ten companies. We nevertheless prohibited defendants from interfering with existing contracts between plaintiff and certain of the named customers. We also modified the accounting requirements.

---

[1] The order precluded contact with ten companies, some of which appear to be communications companies and some of which appear to be site locations.

Defendant Day was first employed by plaintiff Subcarrier Communications, Inc. in 1992. Plaintiff's president, John Paleski, certified that Day was hired as an "independent contractor" and that "[s]he also held the office of corporate vice president." He also stated that plaintiff corporation is engaged "in the business of acquiring and managing tower sites and other sites for wireless communications systems. Basically, [plaintiff] searches for, locates and leases (or purchases) favorable sites on towers and buildings for communication companies to place their wireless communication devices." Plaintiff asserts in its brief that its "'stock in trade' . . . consists of its customer lists, its portfolio of site locations, its rate structures and its engineering reports."

Day worked at plaintiff corporation from 1992 until she chose to leave the company on August 16, 1996. Day's duties included, according to Paleski: (1) "the negotiation of lease terms with customers;" (2) "responsibility for maintaining the confidentiality of [plaintiff's] rate structures or client lists and other corporate property;" and (3) "signatory authority over certain [corporate] bank accounts. . . ." In addition, in March 1996, plaintiff asked Day to open a new office for it in Eatontown.

Day left plaintiff's employ intending to have her own company, but about two weeks after she left plaintiff, she was hired by defendant Sytex, Inc. Day states that Daycomm, Inc., did not begin business until after August 16, 1996, and that the company made no sales and had no profits. Plaintiff, however, alleges that Day formed the company while she was still its vice president. It was not until approximately nine weeks after Day left plaintiff's employ that plaintiff sought the temporary restraints that are the subject of this dispute.

Sytex, Inc. interviewed Day on September 3, 1996, and then hired her to help it commence operations. Day's work at Sytex involved creating a database of potential sites and otherwise building an antenna site management business for Sytex. Day certified that the information required to find a potential site is all in the public domain, either through personal observation, the

Internet, or one of several trade publications. She explained that the companies in the field basically look for tall buildings in a geographical area and solicit their owners or managers for antenna leases. If a lease is possible, the final step is finding a telecommunications user interested in the site. Day denied taking or converting any corporate property for her personal use either before or after she left plaintiff's employ, except she did admit to taking a Point of Contact (POC) list. But even as to that list, she certified that the information on it is readily available and that she threw the list away after Paleski forced his way into her apartment.[2]

 Generally, the equitable relief of a preliminary injunction should not be entered except when necessary to prevent substantial, immediate and irreparable harm. *Citizens Coach Co. v. Camden Horse R.R. Co.*, 29 *N.J. Eq.* 299, 303–04 (E. & A. 1878). "Harm is generally considered irreparable in equity if it cannot be redressed adequately by monetary damages." *Crowe v. De Gioia*, 90 *N.J.* 126, 132–133, 447 *A.*2d 173 (1982). In other words, plaintiff must have no adequate remedy at law. *Green v. Piper*, 80 *N.J. Eq.* 288, 293, 84 *A.* 194 (Ch.1912). Also, "temporary relief should be withheld when the legal right underlying plaintiff's claim is unsettled." *Crowe, supra*, 90 *N.J.* at 133, 447 *A.*2d 173. "A third rule is that a preliminary injunction should not issue where all material facts are controverted. Thus, to prevail on an application for temporary relief, a plaintiff must make a preliminary showing of a reasonable probability of ultimate success on the merits." *Ibid.* (citations omitted). "[T]he final test in considering the granting of a preliminary injunction is the relative hardship to the parties in granting or denying relief." *Id.* at 134, 447 *A.*2d 173.

---

[2] Day filed criminal charges against Paleski for this intrusion into her apartment. Paleski claimed he was trying to retrieve corporate property. This present action was filed after Day filed her criminal complaint.

We also note that the purpose of a preliminary injunction "is to maintain the parties in substantially the same condition 'when the final decree is entered as they were when the litigation began.' " *Ibid.* (quoting *Peters v. Public Service Corp.*, 132 *N.J. Eq.* 500, 29 *A.*2d 189 (Ch.1942), *aff'd o.b.*, 133 *N.J. Eq.* 283, 31 *A.*2d 809 (E. & A.1943)). As we stated in *American Employers' Insurance Co. v. Elf Atochem N.A., Inc.*, 280 *N.J.Super.* 601, 610–11 n. 8, 656 *A.*2d 58 (App.Div.1995):

> Injunctions are usually only granted when without them there would be irreparable harm and money damages would not adequately redress the harm. Other principles to be addressed are whether the legal right on the underlying claim is unsettled, whether material facts are controverted and the "relative hardship to the parties." Additionally, there must be clear and convincing proof in order to grant an injunction.
>
> [Citations omitted.]

*See also Zoning Bd. of Adjustment v. Service Elec. Cable T.V.*, 198 *N.J.Super.* 370, 379, 487 *A.*2d 331 (App.Div.1985).

■ Day argues that the preliminary injunction should not have been issued because she has "denied . . . under oath every material fact on which the plaintiff has relied. . . ." She points out that when affidavits conflict, a court should not attempt to evaluate their credibility without an evidentiary hearing. *Passaic Jr. Chamber of Commerce v. Housing Auth.*, 45 *N.J.Super.* 381, 385, 132 *A.*2d 813 (App.Div.1957).

Despite Day's certifications to the contrary, the trial judge found factually that the information on the POC list "is not readily available." The judge also stated, "It's not necessary that she solicit [plaintiff's customers] before she left the company. If she took the customer lists and solicited them a week or two later, that's just as bad." Further, during argument, Day's counsel pointed out to the trial judge that "[t]here's no evidence . . . that she used [the POC list]." The judge disagreed, stating, "It doesn't make any difference when she used it or what she used it for. She's used it." The judge also stated that he did not believe Day no longer had the list in her possession. The judge concluded that Day has "got to be enjoined from benefiting from what she's

done;" that is, from misappropriating the list. As a result of this finding, the judge issued his temporary injunction preventing all defendants "from soliciting business from and/or doing any business with" the ten specified companies until the final hearing in the matter.

The affidavits on this particular point are clearly in conflict. Day states that she did not use the list. She says that she knew of the customers from her own experience and memory and that the information was readily available to the public. Plaintiff, on the other hand, argued that Day obviously used the list to solicit customers. The court, without hearing testimony, resolved this issue in favor of plaintiff.[3]

Furthermore, Day's certification categorically denied all other allegations made by plaintiff. She stated: (1) she never used corporate money for her personal expenses without permission; (2) the computer she is alleged to have taken is in fact her personal property; (3) Kinko's accidentally charged plaintiff instead of her in the amount of $32.26 for office expenses; (4) her leaving plaintiff was not a secret; and (5) she took no corporate records or documents except for the above-discussed POC list. Nevertheless, the judge kept in place the temporary restraints that directed defendants to return all corporate property and monies. Thus there is clearly a conflict between the affidavits.

■ Even if the court was correct that Day contacted customers from the POC list that she physically possessed for at least ten days, plaintiff was still required to "make a preliminary showing of a reasonable probability of ultimate success on the merits." *Crowe, supra*, 90 *N.J.* at 133, 447 *A.*2d 173. Day argues that the POC list contained only names, addresses and phone numbers that

---

[3] The judge said, "I'm telling you now, sir, that she had this on the computer, the Point of Contact list.... She has not returned it. And I don't believe she trashed it for one minute. Not for one split second. Okay? It's just not logical, and I have to go on what logical people do under logical circumstances, and I don't believe she trashed it."

were known to her or were readily discoverable without resort to the list. The solicitation of some of the companies on the list, she claims, does not prove that she misused the list to find the customers.

In *National Tile Board Corp. v. Panelboard Manufacturing Co.*, 27 *N.J.Super.* 348, 352, 99 *A.*2d 440 (Ch.Div.1953), a defendant leaving his employer removed "a list of [the plaintiff's] customers which had been compiled by him during the course of his employment." It was "conceded that the customers whose names appeared on that list were among those whose trade was solicited by the defendant." *Ibid.* Nevertheless, the court held that "[t]he knowledge of the names of [the plaintiff's] customers is not a trade secret." *Id.* at 353, 99 *A.*2d 440. *See also Abalene Exterminating Co. v. Elges*, 137 *N.J. Eq.* 1, 43 *A.*2d 165 (Ch.1945); *Haut v. Rossbach*, 128 *N.J. Eq.* 77, 15 *A.*2d 227 (Ch.1940), *aff'd o.b.*, 128 *N.J. Eq.* 478, 17 *A.*2d 165 (E. & A.1940). Furthermore, the *National Tile Board* court stated:

> [A]n employee is not compelled to shut his eyes to what goes on in his place of employment nor is he required to wipe his memory clear of those matters which he learns during the course of that employment. So long as no contract express or implied prohibits him from divulging the information learned during his employment, the employee may use that information for his own benefit.
>
> [*National Tile Board, supra*, 27 *N.J.Super.* at 355–356, 99 *A.*2d 440.]

Thus no injunction was issued. *Id.* at 358, 99 *A.*2d 440.

Similarly, although Day did solicit the customers who were on the POC list, she disputes the claim that she needed the list to know whom to contact. She also states affirmatively that the information on the list was not a trade secret. As in *National Tile Board*, Day was not "a party to a contract, express or implied, which prohibited [her] from selling to customers of [her] late employer." *Id.* at 353, 99 *A.*2d 440. Without proof that in this industry the customer lists are held secret, Day's actions were "not objectionable" because "knowledge of the names of [plaintiff's] customers is not a trade secret." *Ibid.* Day was not required "to shut [her] eyes" and "to wipe clear [her] memory." There was no restrictive covenant, nor was there even an employ-

ment contract, and the affidavits were in clear conflict over whether Day improperly used either the list or her recollection of customers.

There are cases where customer lists have been protected. In *AYR Composition, Inc. v. Rosenberg,* 261 *N.J.Super.* 495, 504, 619 *A.*2d 592 (App.Div.1993), the customer lists in a service business were found to be trade secrets. Names of customers, drawn from the general population and not easily discernable by competitors, can be a valuable asset. "Where there is either a post-employment restrictive covenant or where the customer lists are confidential and thus a trade secret, customer lists may be protected even after employment is terminated." *Ibid.* We explained:

> Where a company's business is to provide services, information about customers is a property right of the company. *Abalene Extermination Co., Inc. v. Oser,* 125 *N.J. Eq.* [329,] 331, 5 *A.*2d 738 [Chan.1939]. This is proper because a service company must obtain its customers "at the cost of time, trouble and expense in soliciting and obtaining them as customers...." Where a service company is concerned, the names and addresses of its customers "are not open to and ascertainable by every.one; they are the private information and property" of the company. *Id.* at 332, 5 *A.*2d 738; *but cf. Haut v. Rossbach,* 128 *N.J. Eq.* 77, 78, 15 *A.*2d 227 (Ch.1940), *aff'd,* 128 *N.J. Eq.* 478, 17 *A.*2d 165 (1941) (customers are not assets where company is a "manufacturer or wholesaler dealing with jobbers or retail merchants").

> [*Ibid.*]

*See also Mailman, Ross, Toyes & Shapiro v. Edelson,* 183 *N.J.Super.* 434, 443 n. 4, 444 *A.*2d 75 (Ch.Div.1982) ("An employer has a legitimate interest in protecting [confidential information or trade secrets], even in the absence of a noncompetition agreement"). The Supreme Court, in *Sun Dial Corp. v. Rideout,* 16 *N.J.* 252, 257, 108 *A.*2d 442 (1954), set out the test for determining whether· a list is a trade secret:

> A trade secret may consist of a ... compilation which one uses in his business and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. Its subject matter must not be a matter of public knowledge or of general knowledge within the industry. Although a substantial measure of secrecy must exist, the secrecy need not be absolute and disclosure to employees involved in its use will not ordinarily result in loss of the employer's protection.... Novelty and invention are not essential....

> [Citations omitted.]

But where customers are known in an industry or are easily discernable and personal contacts are taken from job to job, the rule is different. In *Coskey's T.V. & Radio Sales & Serv., Inc. v. Foti*, 253 *N.J.Super.* 626, 629, 602 *A.*2d 789 (App.Div.1992), an injunction had been issued based on a restrictive covenant in an employment contract made between the parties. There, even with the covenant, we "substantially vacated" the injunction because of the "extreme hardship worked upon" the defendant. *Ibid.* We held that the defendant's job consisted of

> efforts [that] were part of the everyday work not only of plaintiff, but also of all its competitors, and it was unfair to make such contacts the triggering actions to warrant injunctive relief.... What [defendant] brought to his employer, he should be able to take away. This is little different than the tradesman who brings his tools to his employer and upon separation leaves with them.... [Defendant's] relationships within the industry were not bought and paid for; they were merely rented during the period of employment.
>
> [*Id.* at 637–638, 602 *A.*2d 789.]

Thus, even when there is a restrictive covenant, a former employee cannot be enjoined from using his or her experience in the industry as a basis for earning a living.

Here, the business consists of looking for tall buildings and other similar places to place antennas. According to plaintiff, the list consisted of the names, addresses, phone numbers and contact persons for customers and site owners or managers, as well as points of contact for site locations. This information may well be "a matter of public knowledge or of general knowledge within the industry," as Day alleges. Day at least showed at the hearing that there was a question of fact whether the POC list was proprietary information, although the judge found that it was proprietary. Any observer could easily determine the tall buildings in a particular geographical area, and the owner's or manager's names are readily discernable on the Internet or, in most cases, by notices posted at the site. Especially with regard to the communication companies on the list, their identities and locations are a matter of common knowledge in the industry. We cannot understand how their identity or plaintiff's relationships with them would be deserving of protection. Yet, defendants were precluded

from contacting several of them because they were on plaintiff's list.[4]

Thus, on this record, the information does not appear to be confidential. If defendants were dealing with long distance telephone carriers, and AT&T, M.C.I., and Sprint were on plaintiff's list, there could be no valid claim that they were protected customers. On this record, the trial court could not determine whether the sites, the carriers or both were sufficiently known or readily discoverable to be precluded from inclusion in any injunction.

Plaintiff additionally argues that Day violated her duty of corporate loyalty by using the list. In *United Board & Carton Corp. v. Britting*, 63 *N.J.Super.* 517, 523–524, 164 *A.*2d 824 (Ch.Div.1959), *aff'd*, 61 *N.J.Super.* 340, 160 *A.*2d 660 (App.Div.), *certif. denied*, 33 *N.J.* 326, 164 *A.*2d 379 (1960), the court distinguished *National Tile Board, supra*, by noting that in that case "the former employees entered into competition with their old employer, in an *honest and legitimate* manner, after severance of the employment relation. In the instant case the former employees acted in a *disloyal and dishonorable* competition with their employer, *while they were still employed by it.*"

Plaintiff claims Day breached her duty to it by establishing her rival corporation before she left its employ. However, Day specifically denies that such was the case, and there was no extrinsic evidence produced to the contrary. Even if this were not so, and Day formed the new company prior to leaving plaintiff, there may have been no violation of her duties to plaintiff. In *Auxton Computer Enterprises., Inc. v. Parker*, 174 *N.J.Super.* 418, 420–422, 416 *A.*2d 952 (App.Div.1980), the defendant Parker left the plaintiff's employ to work for a competitor, also a defendant. Parker tested the waters before leaving his former employer. *Id.* at 421, 416 *A.*2d 952. He did not, however, solicit

---

[4] Apparently, at least five of the companies with which defendants were enjoined from doing business are carriers.

customers or write any orders until he left. *Id.* at 421–422, 416 A.2d 952. The plaintiff alleged, among other things, interference with its economic advantage and unfair competition. *Id.* at 422, 416 A.2d 952. We held:

> An employee who is not bound by a covenant not to compete after the termination of employment, and in the absence of any breach of trust, may anticipate the future termination of his employment and, while still employed, make arrangements for some new employment by a competitor or by the establishment of his own business in competition with his employer. The only restriction to such action is that he may not solicit his employer's customers for his own benefit before he has terminated his employment. Nor may he do other acts in direct competition with the employer's business. . . . It is the nature and character of the act performed that will determine if there has been an actionable wrong and whether or not the act has caused some particular injury to the employer. . . . The mere planning, without more, is not a breach of an employee's duty of loyalty and good faith to his employer.
>
> [*Id.* at 423–424, 416 A.2d 952 (citations omitted).]

This court also noted that later competition with a current employer "may eventually prove harmful to the former employer." *Id.* at 424, 416 A.2d 952. That sort of harm is not actionable; it is called free enterprise.

On the other hand, in *Chernow v. Reyes,* 239 *N.J.Super.* 201, 203, 570 A.2d 1282 (App.Div.), *certif. denied,* 122 *N.J.* 184, 584 A.2d 245 (1990), the former employee solicited business and competed with his soon-to-be former employer during non-working hours while still employed. He was thus held liable for profits earned while still an employee. *Id.* at 205, 570 A.2d 1282.

Here, Day certified that she did not engage in any solicitation or competition while still employed by plaintiff. Also, we note there was no covenant not to compete. Day asserts she merely engaged in permitted planning while she was still employed by plaintiff. The trial judge found only that Day wrote letters dated August 21 to customers on the POC list. However, she had resigned on August 16.

Plaintiff asserts that the injunction is reasonable because of disparaging statements defendants allegedly made to the customers and because defendants were able to undercut plaintiff's prices. This is the nature of competition, although if plaintiff has

been improperly disparaged, the law permits redress by means of a defamation claim.

Plaintiff also argues that an independent basis for relief was presented by defendants' interference with plaintiff's existing contracts and prospective economic relationships. However, this issue was not considered by the trial judge in making his decision and thus is not properly raised on this appeal. Day nevertheless notes that she only sought to compete with plaintiff for new business. Where she found that plaintiff had an ongoing contract with a potential customer, there was no further solicitation. Defendants argue that the law does not generally prohibit Day from leaving plaintiff, setting up a competing business or joining a competitor, and then contacting and soliciting new business from plaintiff's customers, even those who happen to be on the POC list.

Plaintiff additionally claims that Day improperly attempted to use plaintiff's lease forms. However, their source for this claim is a letter written by Day on August 21, 1996, five days after Day left plaintiff's employ, in which she stated to a potential customer, "You and I can use the same PCSD leasing template ... in the future." This offer was unobjectionable for two reasons. First, it did not amount to Day misappropriating private lease templates or forms from plaintiff and then offering them to her own customers. Rather, she was writing to a current customer of plaintiff's and saying that, if they were to enter into a contract, they could merely use the same lease the customer already had with plaintiff. The lease was in the customer's possession, not Day's. Second, the lease template or form itself was not copyrighted and was not a trade secret, since it was given to plaintiff's customers. Therefore, defendants or any other competitor had the right to use the form of lease for that customer or others.

The court also mistakenly found that Day had been passing her company off as a "spin off" from plaintiff. The judge repeatedly stated that Day had said Daycomm, Inc. was a "spin off company" when it was not. Day's letters show clearly, as her attorney argued, that she had told prospects that "I have spun-off from

Subcarrier Communications." [5] (Emphasis added). She did not, therefore, trade on plaintiff's reputation by claiming Daycomm, Inc. was a spin-off of one of plaintiff's operations.

Defendant Sytex claims it "did not induce Ms. Day to leave Subcarrier or utilize any customer lists or other paper or electronic information from Subcarrier to unfairly compete." It is clear Sytex did not induce Day to leave plaintiff's employ, since her initial goal was to start her own company. However, whether Sytex unfairly competed depends on the eventual ruling after the evidentiary hearing ordered with regard to the POC list. Sytex's president stated in his certification that his company intended to do business with those companies Day had dealt with as plaintiff's employee which did not have binding contracts with plaintiff. If parts of the list are eventually found proprietary and the basis for injunctive relief, Sytex may be barred from contact if the source of contact is the POC list.

Sytex also argues that the equities now balance in its favor. It argues that if the injunction were sustained, it would have to terminate both its business in this area, and, with that, Day's employment. In *Crowe, supra,* 90 *N.J.* at 134, 447 *A.*2d 173, plaintiff would have been "devastat[ed]" without the relief, while defendant would have suffered "relatively inconsequential expense." Sytex argues there was no hardship for plaintiff because there is an adequate monetary remedy and thus no injunction was required. *Crowe, supra,* 90 *N.J.* at 132–133, 447 *A.*2d 173. Sytex's claim has merit.

Additionally, monetary damages, if any, could be calculated through an accounting. The trial judge has ordered a monthly accounting of

---

[5] The specific text of the letters varied. For example, one letter read, "I wanted to announce to you, personally, that I have spun-off from SubCarrier Communications and have opened my own site acquisition management firm called DayComm, Incorporated." Another read "I am proud to announce that I have spun-off from SubCarrier Communications and have created DayComm Incorporated, which is a full service site acquisition/management company."

all business booked by ... Defendants relating to the placement of wireless communication devices on buildings or towers for customers since August 16, 1996 describing all sites utilized respecting these accounts—said accounting shall include the name, address, contact person of any customer, the rates charged by the defendants, [and] the lease amount charged by the site owners....

As Sytex points out, should defendants be held liable, this information will enable a finder of fact to calculate the damages incurred by plaintiff. We reject plaintiff's argument that monetary damages are inappropriate because of defendants' alleged interference with plaintiff's existing contracts and with plaintiff's prospective economic advantage. Assuming the POC list was not used improperly, defendants were free to compete with plaintiffs. Thus no injunction was required pending a final hearing.

Sytex also argues that Day owed no duty to plaintiff because she was an independent contractor. Plaintiff describes Day as both an "independent contractor" and as its "vice president." This point is interesting and should be explored at the final hearing. While Day was probably treated as an independent contractor solely for tax reasons, she also was, as Sytex recognizes and admits, plaintiff's employee. The trial court can decide the apparently novel question of the extent of an independent contractor's duty to a corporation with which she contracts to do work. The issue will include whether her records of contacts as an independent contractor are her property, the company's property or shared property. If the company contends that she was basically an employee, the obvious tax ramifications may also have to be explored.

Given our earlier rulings, Sytex's remaining issues need not be considered here.

In sum, because the affidavits conflict regarding Day's use of the POC list and there is no proof that she is now in possession of the list or used any information that was a trade secret, she should not be enjoined without an evidentiary hearing from contacting customers who are on the list. Plaintiff failed to show it had a reasonable probability of prevailing on the merits, and thus the

trial court mistakenly exercised its discretion by issuing the injunction.

The orders of October 18, 1996, and November 7, 1996, are vacated, provided, however, that the accounting, as modified by our order of November 21, 1996, shall continue so that defendants can maintain the records which may be necessary for the award of damages.