BioCORE, INC. and BioCore Medical Technologies, Inc., Plaintiffs,

v.

Hamid KHOSROWSHAHI, Defendant.

No. CIV.A.98–2031–KHV.

United States District Court, D. Kansas.

May 4, 2000.

Joseph W. Hemberger, Daniel B. Denk, Ryan B. Denk, McAnany, Van Cleave & Phillips, Kansas City, KS, Michael M. Shultz, Johnson County Legal Dept., Olathe, KS, BioCore Medical Technologies, Inc., Topeka, KS, for Plaintiffs.

David W. Hauber, Boddington & Brown, Chtd., Kansas City, KS, Timothy F. Butler, New York City, Thomas A. Butler, Butler, Fitzgerald & Potter PC, New York City, Ruth M. Benien, Benien Law Offices, Chtd., Kansas City, KS, for Defendants.

Hamid Khodrowshahi, Tarrytown, NY, pro se.

Margaret Callaci, Tarrytown, NY, pro se.

## MEMORANDUM AND ORDER

VRATIL, District Judge.

This litigation, having now pended for more than two years, is but a fragment of its former self. It is the juridical embodiment of a rancorous vendetta between Manoj Jain, the founder of BioCore, Inc. and BioCore Medical Technologies, Inc., and Hamid Khosrowshahi, a former executive for the corporations. The men were "like family" until June of 1997, when they parted company and started to rev up the litigation engines. When they hired lawyers and filed suit, here and in the United States District Court for the Southern District of New York, the parties apparently forsook a rational approach to the business problems which faced them. Instead, they proceeded to rely upon the destruction of evidence, the manufacture of evidence, and healthy doses of paranoia and vitriol, to govern their strategic decision-making processes. In spite of—or perhaps because of—these decisions, neither gentleman has managed to prevail on any affirmative claim for relief.

Both sides brought an excessive number of claims in this litigation. The corporate plaintiffs brought claims against Khosrowshahi and his wife, alleging that he had (1) converted personnel files and other records; (2) misappropriated funds; (3) entered into unauthorized contracts; (4) breached an agreement not to compete with plaintiffs; (5) breached plaintiffs' trademark rights, along with federal unfair trade practice laws, by using plaintiffs' trademarks; (6) breached fiduciary duties; (7) misappropriated plaintiffs' trade secret information; (8) engaged in unfair competition in violation of the common law by competing with plaintiffs and misappropriating their trade secrets; (9) tortiously interfered with plaintiffs' business and potential economic advantage by misappropriating their trade secrets and using their trademarks; (10) converted a company vehicle; (11) made unauthorized corporate loans to himself; and (12) misappropriated funds by fraudulently reimbursing himself for air travel expense that he did not incur. Plaintiffs also sought reimbursement from Khosrowshahi's wife for double payments of automobile expenses.

Khosrowshahi and his wife responded in kind, by filing an unnecessary plethora of claims against plaintiffs. Defendants' claims included (1) breach of agreements to make Khosrowshahi a ten percent shareholder in the plaintiff corporations, pay him $120,000.00 plus benefits in 1993, and raise his salary to $150,000.00 in 1996; (2) breach of express and implied contracts of employment; (3) unjust enrichment, based on plaintiffs' failure to pay unpaid wages, benefits, and stock shares; (4) violations of Kansas and New York state wage claims, also based on the failure to pay wages, benefits, and stock shares; (5) specific performance of these contracts; (6) failure to reimburse defendant for employment expenses; and (7) retaliatory discharge. Khosrowshahi's wife alleged that plaintiffs had breached a contract to pay her certain wages and wrongfully terminated her employment in violation of ERISA.

From anything which appears of record, this litigation has been full of sound and fury, signifying nothing. *See* William Shakespeare, *The Tragedy of Macbeth,* act 5, sc. 5. The parties have wastefully squandered their litigation resources, leaving claims and attorneys by the wayside, as the litigation marched towards trial. Many claims did little except cloud the picture regarding the true issues of this litigation and prevent the parties from focusing on their strongest claims. Despite the vast number of claims and counterclaims, it has always been apparent that the crux of this case involved two issues— Khosrowshahi's decision to go to work for one of plaintiffs' competitors, and Khosrowshahi's compensation agreement with plaintiffs.

In February of 1999, the Court held a jury trial on the few claims which survived

the summary judgment process, including plaintiffs' claim for misappropriation of trade secrets. *See Minute Sheet* (Doc. # 572). The jury found that Khosrowshahi had misappropriated plaintiffs' trade secrets and awarded plaintiffs $155,236.00 in compensatory damages. The jury rejected the Khosrowshahi compensation claims, finding that plaintiffs did not owe him any wages or stock. Unfortunately for plaintiffs, no evidence supported a damage award of $155,236.00 for misappropriation of trade secrets, and the Court set aside the jury verdict to that effect. The Court therefore ordered a new trial on the misappropriation claim. *See Minute Sheet* (Doc. # 614). While plaintiffs argued that the Court should uphold the jury's finding of liability for misappropriation and limit the new trial to the issue of damages, the Court rejected this argument because it could not determine the extent to which the jury found that misappropriation had occurred.

Following this decision, because no one wanted to either dismiss or re-try the case, the parties agreed to a bench trial on the written record of the first trial. *See Minute Sheet* (Doc. # 652). The matter is now before the Court for ruling on plaintiffs' misappropriation claim. Plaintiffs allege that Khosrowshahi misappropriated their trade secrets when he went to work for a competitor. Khosrowshahi insists that he did not know all of plaintiffs' trade secrets, that many of the alleged trade secrets are public information or otherwise fail to qualify as trade secrets, and that in any event, he did not disclose any trade secrets to plaintiffs' competitor. After reviewing the parties' proposed findings of fact and trial briefs, along with the record of the first trial, the Court is ready to rule. For reasons set forth more fully below, the Court finds that defendant is entitled to judgment on plaintiffs' trade secret misappropriation claim.

## Applicable Law

The existence of a trade secret under the Kansas Uniform Trade Secrets Act is a question of fact for determination by the trier of fact. *All West Pet Supply Co. v. Hill's Pet Products Div.*, 840 F.Supp. 1433, 1437 (D.Kan.1993). The Kansas Uniform Trade Secrets Act (KUTSA), K.S.A. 60–3320 *et seq.*, defines a trade secret as

information, including a formula, pattern, compilation, program, device, method, technique, or process, that:

(i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and

(ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

K.S.A. § 60–3320(4). Whether customer information is generally known or readily ascertainable is a question of fact. *All West*, 840 F.Supp. at 1438. Similarly, whether the possessor of such information has taken reasonable steps to protect its secrecy is also a question of fact. *Id.*

The KUTSA defines misappropriation as:

(ii) disclosure or use of a trade secret of another without express or implied consent by a person who

\* \* \* \* \* \*

(B) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was

\* \* \* \* \* \*

(II) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use . . .

K.S.A. § 60–3320(2). Whether defendant disclosed or used plaintiffs' alleged trade secrets is also a question of fact. *See Hudson Hotels Corp. v. Choice Hotels Int'l*, 995 F.2d 1173, 1178 (2d Cir.1993); *Heyman v. AR. Winarick, Inc.*, 325 F.2d 584, 588(2d Cir.1963). Defendant, as a former vice president of BioCore and president of BMT, had a duty not to disclose any trade secrets he acquired while employed by plaintiffs. Testimony of Hamid

Khosrowshahi, Volume I (Doc. # 610) at 42 (testifying as to positions held); *Koch Engineering Co., Inc. v. Faulconer,* 227 Kan. 813, 828, 610 P.2d 1094, 1105 (1980) (former employee has duty not to disclose trade secrets).

## Findings of Fact

Consistent with the evidence presented at trial, the Court makes the following findings of fact.

Manoj Jain is founder, chairman of the board, chief executive officer, president and sole shareholder of BioCore, Inc. ("BioCore"), a Kansas corporation. BioCore Medical Technologies, Inc. ("BMT") is a wholly-owned subsidiary of BioCore. BMT manufactures and sells SkinTemp, Medifil and other collagen-based products that assist in the healing of wounds.[1] Consumers commonly use such products on "chronic" wounds, *i.e.* wounds which are open for more than six months.

Hamid Khosrowshahi has worked in the wound care field since 1984. Testimony of Hamid Khosrowshahi ("Khosrowshahi Test."), Volume II (Doc. # 611) at 346. He had started a wound care division at Medical Action before he went to work for plaintiffs. Khosrowshahi Test., Volume I (Doc. # 610) at 280. Around August of 1993, Khosrowshahi started work at BioCore, serving as vice president from 1994 through January 1996, when he became president of BMT. On June 25, 1997, Khosrowshahi resigned his employment with BMT. He last visited the BioCore and BMT offices in approximately May of 1997.

While he worked for BioCore and BMT, Khosrowshahi had access to information regarding all four tiers of the manufacturing process. The four tiers are described in four separate documents which contain detailed instructions regarding the steps which are used to make plaintiffs' products. The documents also contain specific information regarding some of plaintiffs'

equipment and modifications thereto. When he resigned, Khosrowshahi kept thousands of pages of plaintiffs' documents. Plaintiffs allege that Khosrowshahi kept information regarding all four tiers of the manufacturing process, but Khosrowshahi disputes this allegation. As discussed below, the Court need not resolve this dispute. It assumes for purposes of its ruling that Khosrowshahi retained documents which contained that information.

Before he resigned, Khosrowshahi began talking to Integra LifeSciences, Inc. ("Integra") about a job. He signed a confidentiality agreement with Integra on July 3, 1997, and several days later, on July 9, 1997, he provided samples of plaintiffs' products to Integra for a laboratory analysis. The next day, July 10, 1997, Khosrowshahi entered into a consulting agreement with Integra. Under the agreement, Khosrowshahi was to receive $10,000 per month. At Khosrowshahi's request, Integra also agreed to indemnify him "for any and all liabilities arising out of" his work for Integra.[2] Integra did not have a product which competed with plaintiffs' products, and Khosrowshahi's primary responsibility was to "set forth and begin execution of an operating plan for a collagen-based wound care business." Testimony of William Hickerson ("Hickerson Test."), (Doc. # 678) at 110–15.

Around October 10, 1997, Integra asked Khosrowshahi to enter into a new consulting agreement which eliminated the indemnification provision and required that Khosrowshahi provide a list of plaintiffs' customers. *See* Ex. 244 (October 10, 1997 Letter from McKinney to Khosrowshahi Outlining Proposal for Employment). Khosrowshahi did not sign the proposed agreement, however, because it would require him to disclose plaintiffs' customers. Khosrowshahi Test., Volume I (Doc. # 610) at 91. Later, Khosrowshahi signed

---

1. Collagen is a protein-based substance that is most commonly derived from animal hides and other mammal parts.

2. While the salary was significantly higher than what Khosrowshahi had earned at BioCore and BMT, it was close to what Medical Action had paid him. Khosrowshahi Test., Volume I (Doc. # 610) at 88, 221, 234.

a new consulting agreement which did not require him to provide a customer list and restored the indemnification requirement. *See* Ex. 245 (October 15, 1997 Letter from McKinney to Khosrowshahi Outlining Proposal for Employment). The agreement also provided that Khosrowshahi would receive an eight per cent commission for sales to prior distributors of collagen wound care products and a three per cent commission for sales to new distributors.

As part of his employment, Khosrowshahi created a business plan to introduce Integra to the process of manufacturing collagen wound care products. The plan was dated July 23, 1997. *See* Ex. 248 (Integra's Strategic Options For Entering Wound Care Market). Integra was trying to create a wound care product which would compete with plaintiffs' products, and it used plaintiffs' products for comparison, in its attempts to "replicate" those products. *See* Ex. 250 (August 25, 1997 Memo from Warshafsky re: Collagen Wound Dressing Project Team Meeting, at I00504); Ex. 254 (September 8, 1997 Memo from Warshafsky to Khosrowshahi and Others re: Collagen Wound Dressing Project Team Meeting, at I00179). Integra planned to have a competing product on the market by March or April of 1998. To accomplish this goal, it formed a collagen wound dressing team which included Khosrowshahi.

As part of its effort to develop collagen wound care products, Integra wanted to perform controlled studies on medical patients, using both its product and plaintiffs' product. Khosrowshahi agreed to provide plaintiffs' products and arranged to purchase them from plaintiffs' distributors. By January of 1998, however, the Integra project was dead. Integra never introduced into the market any collagen product that competed with plaintiffs' products.

### 1. Manufacturing Process

■ Plaintiffs assert that the process which they use to manufacture their products—including the ingredients, equipment, processing, and other elements—is a trade secret. A trade secret can exist in a combination of components, each of which, by itself, might be in the public domain. A knowledge of the best combination of processes or systems of combination of elements may amount to a trade secret. *Mann v. Tatge Chem. Co.*, 201 Kan. 326, 334, 440 P.2d 640, 647 (1968).

■ Some people who use plaintiffs' products consider them to be extremely effective and prefer plaintiffs' products over similar ones. Testimony of Cindy Ahearn, (Doc. # 677) at 61–63; Testimony of Tamara Fishman (Doc. # 677) at 75–80. Richard Walsh, who distributed plaintiffs' products, considered them to be the most effective wound care product. Deposition of Richard Walsh at 43–45, 76, 77, 101, 132. Plaintiffs' manufacturing process yields a product which consumers purchase because they believe that it out-performs other wound care products in the market. Information about the manufacturing process therefore has economic value and the fact that it is not generally known enables plaintiffs to produce products which their customers find to be superior to competing products. *See* K.S.A. § 60–3320(4).

Further, plaintiffs have taken reasonable steps to prevent others from learning the entire process. For instance, a key element in plaintiffs' production process is Chemical Z, which plaintiffs use as a nucleating agent for collagen. The formula for Chemical Z is heavily protected and only a select few of plaintiffs' employees know what it is. The Court therefore concludes that plaintiffs entire manufacturing process is a trade secret under Kansas law. *See* K.S.A. § 60–3320(2).

Plaintiffs have not established, however, that Khosrowshahi misappropriated their trade secret manufacturing process. Khosrowshahi did not know the composition of Chemical Z. Testimony of Manoj Jain, Volume III (Doc. # 663) at 536. He could not misappropriate the entire manufacturing process because he did not know the entire process.[3]

---

**3.** The conclusion that Khosrowshahi did not know the entire process is supported by the

At best, plaintiffs have proved that Khosrowshahi misappropriated specific elements of the process which in their own right constituted trade secrets. Therefore the Court must determine whether any element was a trade secret and whether Khosrowshahi misappropriated it.

### 2. Crystalline Structures

■ Plaintiffs assert that they have a trade secret in the crystalline structures which make up their products and influence their wound-healing properties. *See* Ex. 48 (BioCore Trade Secret Claims). It is unclear whether plaintiffs claim that the end product is a trade secret because it possesses crystalline structures, or whether they claim that the crystalline structure is itself a trade secret. To the extent that plaintiffs make the former argument, the Court's prior analysis applies. Khosrowshahi did not have information sufficient to produce the end product, and he therefore did not misappropriate any crystalline structure which might have resulted from that process. To the extent that plaintiffs assert that the crystalline structure is itself a trade secret, the Court disagrees. Any competitor with a microscope can readily ascertain plaintiffs' crystalline structure. *See* Testimony of Brad Fowler (Doc. # 668) at 23. In fact, plaintiffs did not even try to keep this information from the public; they included photographs of their crystalline structures in their promotional materials. *See* Ex. 37, "A New Direction In Health Care" (Nine Point Sales Plan); Ex. 459E, BioCore, Inc. Educational Material. When photographs reveal the alleged secret properties of a product, these properties are not trade secrets. *See Wheelabrator Corp. v. Fogle*, 317 F.Supp. 633, 638 (W.D.La.1970). Plaintiffs do not have trade secrets in the crystalline structures of their products.

### 3. Raw Materials

Plaintiffs begin the manufacturing process by purchasing a collagen slurry or dough which is made from cowhide. Testimony of Brad Fowler (Doc. # 668) at 41, 55–56, 68, 70–71; Khosrowshahi Test., Volume I (Doc. # 610) at 11. Plaintiffs assert that the specifications of this slurry are trade secrets.

■ Plaintiffs first claim a trade secret in their use of bovine hides as a source of collagen. *See* Ex. 48, BioCore Trade Secret Claims. This position is untenable. Bovine hides are the most abundant and common source of collagen. *See* Ex. 459E (BioCore, Inc. Educational Material, at 2); Testimony of Frederick R. Silver (Doc. # 669) at 60. Plaintiffs have not shown that their products are materially superior—or even different—because they use the predominant source of collagen. Therefore, even if this "secret" was not generally known, it does not create economic value for plaintiffs from the fact that it is "secret." Second, even if bovine hides were not the most abundant and common source of collagen, and thus generally known, plaintiffs have not shown that they took reasonable steps to protect the secrecy of their collagen sources. Plaintiffs produced promotional materials which either suggested (Ex. 459E, Bio-Core, Inc. Educational Material) or expressly stated (Ex. 459F, Clinical Presentations in Wound Healing) that plaintiffs use bovine hides. *See* Ex. 459E, BioCore, Inc. Educational Material; 459F, Clinical Presentations in Wound Healing. Plaintiffs distributed these promotional materials to medical professionals, among others. *See* Testimony of Brad Fowler (Doc. # 668) at 30.

Further, the fact that plaintiffs' product has three different types of collagen—Types I, III and V—is not a trade secret. People in the wound care field know that bovine hide has these three types of collagen. *See* Testimony of Frederick R. Silver (Doc. # 669) at 61. In addition, plaintiffs have not taken any steps to protect the

fact that despite his assistance, Integra was unable to reverse engineer plaintiffs' products.

secrecy of this information; again, plaintiffs' promotional material lists the sources for each type of collagen. *See* Ex. 459E, BioCore, Inc. Educational Material.

 Likewise, the fact that plaintiffs' product contains fatty acids and ash is not a trade secret, it is a known result of using cowhides. Testimony of Frederick R. Silver (Doc. # 669) at 33. To the extent that plaintiffs argue that the exact amounts of fatty acids and ash constitute trade secrets, they introduce no evidence which suggests that the amounts contained in their products are unusual or uncommon in cowhide collagen products. Plaintiffs must show how their product differs from matters of general knowledge in the trade. *See Trandes Corp. v. Guy F. Atkinson Co.,* 996 F.2d 655, 661–662 (4th Cir.1993). The Court has already found that the use of cowhide is not a trade secret, and on this record it can only infer that other wound care producers obtain similar amounts of fatty acids and ash by using cowhide collagen. Further, Integra memos note that plaintiffs' products are two to three per cent fatty acids and ash.[4] *See* Ex. 250. Integra was able to discern the percentage of fatty acids and ash from its own analysis of plaintiffs' products. The information is therefore reasonably ascertainable and not a trade secret.

 Plaintiffs also contend that the exact pH level of their raw material is a trade secret. Integra, however, discovered the pH level of plaintiffs' products by performing a chemical analysis on them. Khosrowshahi Test., Volume I (Doc. # 610) at 262; Ex. 250 (August 25, 1997 Memo from Warshafsky re: Collagen Wound Dressing Project Team Meeting). Jain admitted that competitors could determine the pH level by reverse engineering. *See* Testimony of Manoj Jain, Volume I (Doc. # 661) at 102. Therefore the pH level of plaintiffs' products was reasonably ascertainable and not a trade secret.

Further, plaintiffs have not shown misappropriation by Khosrowshahi. Integra documents state that Integra had independently determined the pH level of plaintiffs' products, and Khosrowshahi was surprised to discover what Integra had found because Integra's pH information was inconsistent with the pH information contained in plaintiffs' advertising. *See* Ex. 250 (August 25, 1997 Memo from Warshafsky re: Collagen Wound Dressing Project Team Meeting, at I00504); Khosrowshahi Test., Volume I (Doc. # 610) at 261–62.

### 4. Processing Parameters

 After plaintiffs receive the collagen slurry, they mix it with a nucleating agent which they call Chemical Z. Testimony of Manoj Jain, Volume I (Doc. # 661) at 75–76. Plaintiffs' products require Chemical Z; it is a necessary and critical part of the manufacturing process. Testimony of Manoj Jain, Volume III (Doc. # 663) at 536. Chemical Z is a type of glucose which creates a good crystalline structure that allows very stable fibers. Testimony of Manoj Jain, Volume I (Doc. # 661) at 86. Plaintiffs allege that they have a trade secret in Chemical Z. Even assuming that this allegation is true, however, plaintiffs have not proved that Khosrowshahi misappropriated any information about it. Khosrowshahi did not know the content of Chemical Z. Testimony of Manoj Jain, Volume III (Doc. # 663) at 536. Plaintiffs therefore fail to show any misappropriation of Chemical Z.

When mixing Chemical Z with the slurry, plaintiffs use a commercial mixer which they have modified to provide the desired results. Testimony of Manoj Jain, Volume I (Doc. # 661) at 94–95; Testimony of Brad Fowler (Doc. # 668) at 24–26. More specifically, plaintiffs modified the jacket (to allow control of the temperature), the design of the blades (to get a different

---

**4.** The Integra percentages are different from the information contained in plaintiffs' own product specifications. *See* Ex. 48 (BioCore Trade Secret Claims). This fact strongly suggests that Khosrowshahi was not the source of the Integra calculations regarding fatty acids and ash.

shear rate), and the flow of the mixture (to permit recirculation through the mixer). Testimony of Manoj Jain, Volume I (Doc. # 661) at 94–95.

Once plaintiffs mix the collagen slurry with the nucleating agent, they freeze it. Plaintiffs place the slurry in aluminum trays in a freezer which prevents settling of materials by cooling both the top and the bottom of the trays. Testimony of Manoj Jain, Volume I (Doc. # 661) at 108. Plaintiffs have determined the exact temperatures, time periods, surfaces and other specifications for this process. *Id.* at 108–09. Plaintiffs have also modified the refrigeration systems to achieve the desired results. *Id.* at 109.

Plaintiffs then freeze dry the frozen slurry. While freeze drying equipment is available commercially, plaintiffs have modified their freeze drier to achieve the proper results. *Id.* at 112.

To make SkinTemp, plaintiffs cut the freeze-dried material with a paper cutter which they have modified. *Id.* at 115. To make Medifil particles, they grind the dried material. Plaintiffs use a grinder which is commercially available, but they have experimented to determine the best types of blades and the best blade angles. *Id.* at 117–18.

Plaintiffs allege that they have a trade secret in each processing step which they use to make their products. The Court finds, however, that these uses of mixers, freezers, freeze dryers and grinders are not trade secrets. Other persons in this field know that this type of equipment is used to produce collagen-based products. Testimony of Dragan Radonjic (Doc. # 678) at 188; Testimony of Frederick R. Silver (Doc. # 669) at 27. Plaintiffs have provided no specific information regarding their particular equipment and the modifications which they have made. The Court must therefore conclude from the generalized and conclusory evidence before it that plaintiffs' use of mixers, freezers, freeze dryers and grinders is not a trade secret.

It is quite possible that plaintiffs do have trade secrets in their equipment and the conditions under which it operates, such as the time and temperature of the freezer, the speed and angles of the grinder blades, and the modifications to the equipment. *See* Testimony of Dragan Radonjic (Doc. # 678) at 189. Even assuming that the processing conditions are trade secrets, however, plaintiffs must further establish that Khosrowshahi knew these conditions and that he provided them to Integra. Plaintiffs have not shown such misappropriation.

The record contains little evidence which suggests that Khosrowshahi disclosed any information regarding equipment, modifications and processing conditions. Plaintiffs rely mainly on circumstantial evidence which allegedly suggests that Integra hired Khosrowshahi in exchange for his agreement to disclose trade secrets. Plaintiffs attempt to meet their burden of proof by establishing that (1) Khosrowshahi had access to documents which detail most of plaintiffs' manufacturing conditions and (2) Khosrowshahi had a significant falling out with Jain and wanted to harm plaintiffs in the best way he could—by driving them out of business. Plaintiffs must do more, however, than merely establish that Khosrowshahi knew trade secrets and had an evil heart. While plaintiffs suggest that Khosrowshahi had reasons to harm them, such evidence does not establish that he acted on his alleged motive by disclosing trade secrets. Plaintiffs' evidence simply does not establish that Khosrowshahi misappropriated trade secrets. Just as plaintiffs cannot "simply persist in the blunderbuss statement that 'Everything you got from us was a trade secret,'" *qad. inc. v. ALN Associates, Inc.,* 1990 WL 93362 at *2 (N.D.Ill.1990), plaintiffs must likewise identify with specificity what trade secrets Khosrowshahi disclosed. *See Utah Medical Prods., Inc. v. Clinical Innovations Associates, Inc.,* 79 F.Supp.2d 1290, 1312–13 (D.Utah 1999); *Pulsecard, Inc. v. Discover Card Servs., Inc.,* 1996 WL 137819 at *3 (D.Kan.1996); *AMP Inc. v. Fleischhacker,* 823 F.2d 1199, 1203 (7th Cir.1987). Plaintiffs must offer more than vague as-

sertions that "defendant could not help but use trade secret information." *Utah Med. Prods.*, 79 F.Supp.2d at 1313. Plaintiffs have little evidence, however, that hints at disclosure of specific information regarding their manufacturing processes.

Plaintiffs cite evidence that Khosrowshahi suggested that Integra might need to purchase a new grinder. *See* Ex. 278 (October 30, 1997 Memo from Khosrowshahi to Nociolo re: 1998 Budget For Collagen Dressings). As noted above, however, the fact that plaintiffs use a grinder is not a trade secret. Further, this evidence does not establish that Khosrowshahi disclosed information regarding plaintiffs' grinder. The record shows that Integra had means to grind its product well before Khosrowshahi suggested that another grinder might be needed, and also that Integra was well satisfied with the results of its original grinder. *See* Ex. 273 (September 15, 1997 Memo from Constantine to Khosrowshahi and Others re: Minutes for Bovine Collagen Particle Meeting); Ex. 271 (Integra Collagen Particles Information, at I00822). Further, the evidence does not suggest that Integra actually purchased the additional grinder. Shortly after Khosrowshahi suggested the new grinder, Integra stopped its collagen wound care project. The record therefore suggests nothing more than the casual mention of a possible need for an additional grinder. Further, the record does not suggest that Khosrowshahi revealed any information regarding modifications to the grinder.

Plaintiffs assert that they have a trade secret in grinder specifications which allow them to produce a certain particle size. Internal memos show that Integra attempted to replicate plaintiffs' particle size through trial and error. *See* Ex. 250 (August 25, 1997 Memo from Warshafsky re: Collagen Wound Dressing Project Team Meeting, at I00504); Ex. 254 (September 8, 1997 Memo from Warshafsky to Khosrowshahi and Others re: Collagen Wound Dressing Project Team Meeting, at I00179). This fact undermines any inference of improper disclosure, because if Khosrowshahi knew plaintiffs' grinder

specifications, trial and error would have been unnecessary. Plaintiffs have failed to meet their burden of proving that Khosrowshahi disclosed any trade secrets regarding their grinder.

Plaintiffs identify only one other piece of evidence which remotely suggests that Khosrowshahi disclosed information regarding equipment and specifications. In his project proposal, Khosrowshahi noted that Integra could use its current technology "with slight modification of the process." Ex. 264 (Concept Development Proposal Questionnaire Submitted by Khosrowshahi, at I00766). This comment arguably suggests that Khosrowshahi intended to make precisely that "slight modification," using plaintiffs' trade secrets. The Court, however, is not persuaded. First, the comment is wholly insufficient to establish that Khosrowshahi disclosed any *specific* trade secret. *See Utah Med. Prods.*, 79 F.Supp.2d at 1313. It does not suggest any equipment or process which Khosrowshahi was capable of modifying to achieve the intended result. Furthermore, as with the grinder, plaintiffs provide no evidence that Khosrowshahi did anything more than suggest equipment modification. The record does not suggest that Integra's plan progressed far enough to require disclosure of information regarding the equipment modifications and specific conditions which plaintiffs adopted.

Most importantly, the Court does not read Khosrowshahi's statement as suggesting that he was planning to disclose information about plaintiffs' process. Khosrowshahi did not state that Integra needed to modify its equipment; only that Integra needed to modify its process. Khosrowshahi testified that Integra was able to make a similar product by simply grinding up an existing product, thereby adding another step to the process which Integra already followed. Khosrowshahi Test., Volume I (Doc. # 610) at 78. The Court finds that this interpretation of Khosrowshahi's vague statement is more reasonable than an inference that Khos-

rowshahi intended to copy plaintiffs' equipment, modifications and specifications. Integra documents show that Khosrowshahi and Integra intended to use Integra's existing equipment. Ex. 264 (Concept Development Proposal Questionnaire Submitted by Khosrowshahi, at I00767); Ex. 271 ( Integra Collagen Particles Information, at I00822). It is not reasonable to infer that Integra had exactly the same equipment as plaintiffs and plaintiffs' expert, a former employee of Integra, in fact noted that Integra had different equipment. *See* Testimony of Dragan Radonjic (Doc. # 678) at 167–68. Integra's intent to use its own equipment therefore suggests that Khosrowshahi did not disclose any knowledge concerning plaintiffs' equipment or processing conditions. If Integra used different equipment, it had to create its own blend of conditions to make a successful product; the conditions which worked with plaintiffs' equipment would not reach the same result on different equipment. Testimony of Brad Fowler (Doc. # 668) at 54. The Court therefore finds that Khosrowshahi did not disclose any of plaintiffs' trade secrets in their manufacturing process.

As noted above, plaintiffs' evidence is primarily focused on Khosrowshahi's intent to harm them. Within the bounds of the law, Khosrowshahi was free to act on any animosity, *i.e.* by working for a competitor without revealing trade secrets. Plaintiffs' evidence is simply insufficient, however, to infer misappropriation. The Court cannot find that Khosrowshahi revealed trade secrets generally, let alone that he disclosed specific trade secrets which are revealed by the evidence. Plaintiffs therefore fail to meet their burden of proving that Khosrowshahi disclosed trade secrets in their manufacturing process.

### 5. Efficacy Studies and FDA Procedures

Plaintiffs allege that they have developed standard operating procedures for their clinical trial studies and FDA approval, and that these methodologies are trade secrets. Ex. 48 (BioCore Trade Secret

Claims); Testimony of Manoj Jain, Volume I (Doc. # 661) at 59; Testimony of Jacob Maczuga (Doc. # 676) at 42. Plaintiffs do not cite specific evidence of these procedures, however, and the Court finds little record evidence of specific examples. The Court finds no evidence regarding any methodologies which plaintiffs use in all efficacy studies, and the record suggests that various doctors use various protocols when they perform their studies. Plaintiffs have failed to meet their burden of proving that their method of conducting efficacy studies is different from methods that are matters of general knowledge in the trade. *See Trandes Corp.*, 996 F.2d at 661–662; *see also Utah Med. Prods.*, 79 F.Supp.2d at 1312–13 (plaintiffs must define trade secret "with the precision and particularity necessary to separate it from the general skill and knowledge" possessed by others); *Phillips v. Frey*, 20 F.3d 623, 628 (5th Cir.1994) (trade secret "must possess at least that modicum of originality which will separate it from everyday knowledge"). The Court therefore cannot find that plaintiffs have a trade secret in efficacy methodologies.

Plaintiffs do cite a validation protocol for FDA approval, *see* Ex. 303 (Process Validation Protocol—Medifil Gel), and a procedure which they follow when validating processes. *See* Ex. 296, BMT Quality Policy Manual—Tier II at QSP–402. While both of these items are marked confidential, they contain nothing but basic information. Plaintiffs do not show that the validation protocol and validation procedures are not generally known. They provide no evidence regarding protocols and procedures which other companies use. *See National Tile Board Corp. v. Panelboard Mfg. Co., Inc.*, 27 N.J.Super. 348, 99 A.2d 440, 444 (1953) (while plaintiffs alleged trade secret, no evidence that they were familiar with methods used by other companies); *see also* Roger M. Milgrim, *Milgrim on Trade Secrets*, § 1.07[2]. Neither document describes any procedure that appears to be out of the ordinary; the documents list obvious procedures which

**1232**

every company in the field would also follow with slight but obvious variations for specific equipment and products. Last, Integra used the Freedom of Information Act to obtain the Skin Temp and Medifil records which plaintiffs provided the FDA. *See* Testimony of Manoj Jain, Volume III (Doc. # 663) at 525–26; Khosrowshahi Test., Volume I (Doc. # 610) at 83; Ex. 251 (510(k) Information on Skintemp); Ex. 252 (510(k) Information on Medifil).

Exhibits 251 and 252 describe the validation procedure which plaintiffs followed. While plaintiffs suggest that not all of the documents in these exhibits came from the FDA, plaintiffs do not suggest that the validation information which the exhibits contain was anything but public information. *See Independent Drug Wholesalers Group, Inc. v. Denton*, 1993 WL 191393 at *6 (D.Kan.1993) (public information not trade secret). Plaintiffs fail to meet their burden of proving that the validation procedures and protocols are not generally known or reasonably ascertainable.

Under FDA regulations, no company can currently claim that its product is effective in healing wounds. Testimony of Manoj Jain, Volume I (Doc. # 661) at 59. Plaintiffs, however, allege that they are developing a methodology which will allow them to get FDA approval for a claim of product efficacy. Testimony of Manoj Jain, Volume I (Doc. # 661) at 59; Testimony of Jacob Maczuga (Doc. # 676) at 42. Plaintiffs have not obtained such approval, however, and the record contains no evidence which suggests that their methodologies have actually increased the likelihood of obtaining such approval. *See* Testimony of Frederick R. Silver (Doc. # 669) at 67–68. Further, plaintiffs do not cite evidence of specific methodologies or describe how their methodologies will help obtain FDA approval. Plaintiffs further fail to show how their methodologies differ from those used by others who seek such FDA approval. The Court therefore has no reason to believe that plaintiffs' methodologies have economic value in not being generally known. Plaintiffs do not meet their burden of proof by making conclusory allega-

tions that trade secrets exist. *See Trandes*, 996 F.2d at 661–62. The Court therefore cannot find that plaintiffs have a trade secret in these methodologies.

Finally, plaintiffs apparently contend that the results of their efficacy studies are trade secrets. In their efforts to obtain customers, however, plaintiffs' marketing materials repeatedly emphasize the results of their efficacy studies. This marketing material includes closure rates, cost benefits and time benefits of plaintiffs' collagen-based products. *See* Ex. 37 ("A New Direction In Health Care" (Nine Point Sales Plan), at B25248, B25258–59, B25262, B25266–67); Ex. 459K (BioCore Kollagen Study Brochure (Studies 1–6)); Testimony of Brad Fowler (Doc. # 668) at 32 (testifying that Ex. 459K released to public). Plaintiffs do not cite any efficacy results which they did not provide to the public. The Court therefore finds that plaintiffs did not take reasonable steps to protect the secrecy of any trade secrets in the results of their efficacy studies.

### 6. Cost Structure of Product

■ Plaintiffs also contend that the cost structures of their products, *i.e.* how much they pay to produce their products, are trade secrets. *See* Testimony of Jacob Maczuga (Doc. # 676) at 41. While plaintiffs contend that Khosrowshahi disclosed their cost structures, they cite to no evidence in support of this claim. Plaintiffs claim that Khosrowshahi used their pricing table to suggest what prices Integra could charge for similar products. *See* Ex. 248 (Integra's Strategic Options For Entering Wound Care Market, at I00169). Plaintiffs did not have a trade secret, however, in their retail price structure. Plaintiffs did not take any steps to keep this information a secret: they disclosed their prices to the general public. The fact that Khosrowshahi referred to plaintiffs' market prices does not give rise to a reasonable inference that he disclosed plaintiffs' cost structure. Given that Integra was attempting to create a product which was

similar to plaintiffs' products, Integra could reasonably refer to plaintiffs' prices in analyzing its potential market. Any inference of misappropriation is too weak to meet plaintiffs' burden of proof. As Khosrowshahi testified, he had not done a cost analysis to determine what Integra's new collagen product would cost. Khosrowshahi Test., Volume I (Doc. # 610) at 103–04. Because he was suggesting a product to compete with plaintiffs' products, it would be reasonable for Khosrowshahi to assume that the product should cost about as much as plaintiffs' products cost, especially because Integra already had the necessary technology and equipment. The Court finds that Khosrowshahi did not misappropriate information regarding plaintiffs' cost structure.

## 7. Marketing Strategies

■ Plaintiffs allege that they have a trade secret in their marketing strategies. Specifically, plaintiffs allege that they focus on three aspects to market their products: (1) educating the end user; (2) linking science, product, reimbursement and legal issues; and (3) developing a standard of care for wounds. See Ex. 48 (BioCore Trade Secret Claims). While plaintiffs have shown that they did these things, see Ex. 37 ("A New Direction In Health Care" (Nine Point Sales Plan)); Ex. 459E (Bio-Core, Inc. Educational Material; 459F, Clinical Presentations in Wound Healing); Ex. 459H (Early Clinical Experience With Topical Collagen); 459K (BioCore Kollagen Study Brochure (Studies 1–6)), the Court cannot agree that their strategies were trade secrets. For one thing, plaintiffs revealed these marketing strategies in their promotional materials. See id. Anyone who sees plaintiffs' promotional materials can easily discern their marketing tactics. In addition, even without the help of plaintiffs' promotional materials, another company in the collagen wound-care field can market its products in exactly the same way. Because many different types of wound care products are available, a collagen producer obviously wants to educate potential customers about collagen products. Because a collagen producer is catering to medical customers, it obviously wants to address reimbursement and legal issues regarding collagen-based products. And obviously, every developer of a medical product wants to tout the success of its product and make it the standard of care in the industry. Plaintiffs produce no evidence that their marketing methods differ in any way from those generally used. See Utah Med. Prods., 79 F.Supp.2d at 1312–13; National Tile Board, 99 A.2d at 444. Plaintiffs' marketing strategies did not give them any economic value in not being generally known or reasonably ascertainable and plaintiffs did not take reasonable steps to protect the secrecy of their marketing methods.

## 8. Sales Strategies

■ Plaintiffs allege that they had trade secrets in their sales strategies. Plaintiffs allege that these strategies included (1) identifying potential customers; (2) demonstrating the benefits of their product to customers; and (3) sale closing techniques. See Ex. 48 (BioCore Trade Secret Claims). Plaintiffs allege that they conducted massive research to discover potential markets. As an example, plaintiffs cite their market penetration among podiatrists. Ex. 48 (BioCore Trade Secret Claims). The Court is not convinced that plaintiffs have trade secrets in determining potential markets. As plaintiffs' materials discuss, the wound care market is fragmented and patients receive different types of treatments depending upon the type of wound they have. Ex. 63E (1996 Business Plan, at B01942). Plaintiffs attempted to make their products the standard of care for all types of wounds, i.e. doctors would use plaintiffs' product on any type of wound. See Ex. 37 ("A New Direction In Health Care" (Nine Point Sales Plan)); Ex. 63E (1996 Business Plan at B01944). Plaintiffs' target market, according to their own materials, was the entire wound-care field. See id. For makers of wound-care products, this market is generally known. Further, to the

1234

extent that plaintiffs focused upon individual types of wounds, plaintiffs' strategy was not a trade secret. Plaintiffs listed major types of wound care patients in their promotional materials and did not make any attempt to keep their target markets secret. See Ex. 37 ("A New Direction In Health Care" (Nine Point Sales Plan), at B25263). The only specific example of a trade secret market which plaintiffs cite is podiatry, but plaintiffs advertised the fact that their product was useful on diabetic feet wounds. See Ex. 459F (Clinical Presentations in Wound Healing); Ex. 459I (Tracking the Diabetic Foot). Plaintiffs did not attempt to hide the fact that they marketed their product to podiatrists.

Moreover, the record does not support plaintiffs' claims of massive marketing research. Plaintiffs' former salespeople testified that they did not do anything special in finding customers for plaintiffs' wound care products. They simply used the phone book, obtained lists from wound care organizations, attended wound care meetings and sales meetings, and followed up on any leads these created. Testimony of Mary Kubitschek (Doc. # 665) at 5–6; Testimony of Byron Fry (Doc. # 679) at 246, 253. Before he went to work for plaintiffs, Khosrowshahi recognized the most common wound care markets, including those for burns, ulcers, and difficult wounds. Ex. 458C (Medical Action Industries, Inc. Marketing Plan, at 14689). The Court finds that the markets for wound care products were generally known.

Plaintiffs also allege that they emphasized educating their customers and demonstrating the effectiveness of their product at a level that varied according to each customer's level of knowledge. Ex. 48 (BioCore Trade Secret Claims). As discussed above, however, plaintiffs disclosed these strategies in their marketing materials, which both attempted to educate their customers and demonstrate the effectiveness of their product. See Ex. 37 ("A New Direction In Health Care" (Nine Point Sales Plan)); 459E (BioCore, Inc. Educational Material); 459F (Clinical Presen-

tations in Wound Healing); 459K (BioCore Kollagen Study Brochure (Studies 1–6)). These strategies are therefore not trade secrets; plaintiffs did not attempt to keep them secret. In addition, such strategies are generally known. As discussed above, a company which markets a medical product would want to educate customers about the product and demonstrate its effectiveness. Plaintiffs provide no evidence that their advertising strategy had a modicum of originality that separated it from others in the field. See Phillips, 20 F.3d at 628; National Tile Board, 99 A.2d at 444

Plaintiffs finally allege that they had perfected techniques for closing sales with potential customers. Ex. 48, BioCore Trade Secret Claims. Plaintiffs provide no evidence of exactly how they closed sales with potential customers, and the Court therefore cannot say that these methods are a trade secret. See Trandes, 996 F.2d at 661–662.

**9. Personnel Strategies/Management Techniques**

Plaintiffs allege that they have trade secrets in the geographic areas they target for sales and in their sales network, because they have determined the most efficient sales approach. Plaintiffs cite no evidence regarding the secret methods they use. Therefore they do not meet their burden of proof. Further, the evidence shows that plaintiffs simply used various national and regional distributors for their products. Ex. 63E (1996 Business Plan at B01949). This is not a trade secret, because plaintiffs' competitors also rely on distributors as the key to gaining national recognition. Ex. 532 (Research Paper by College Student Prepared for Plaintiffs, at SC01130). Plaintiffs fail to show that this information was not generally known.

**10. Customer Lists**

Plaintiffs allege that they developed a customer database that includes information relating to users of collagen

products and lists potential customers whom plaintiffs have educated about the benefits of collagen dressings. Ex. 48 (BioCore Trade Secret Claims). Because the customers themselves are not trade secrets, *see Garst v. Scott*, 114 Kan. 676, 220 P. 277, 278 (1923), Milgrim's at § 1.09[7], courts generally provide trade secret protection only to tangible customer lists. *See* Milgrim's, § 15.01[1][e]. Plaintiffs must therefore prove that a tangible list existed and that Khosrowshahi misappropriated it. *See Montgomery Bulk Exp., Inc. v. Pavlich, Inc.*, 1990 WL 154205 at *1 (D.Kan.1990). Plaintiffs do not provide their database or even a sampling of information it contains.

■ Even assuming that plaintiffs had met their burden of proving the existence of a database, they have not explained in detail the contents of the database. *See Pulsecard, Inc. v. Discover Card Services, Inc.*, 1996 WL 137819 at *6 (D.Kan.1996) (conclusory allegation of customer list not sufficient evidence to avoid summary judgment). Whether a customer list is a trade secret is a fact-intensive inquiry which is highly dependent upon the contents of the list. *See Koch*, 227 Kan. at 831, 610 P.2d at 1107. A simple list of names and addresses is not necessarily a trade secret. *See Fleming Sales Co. v. Bailey*, 611 F.Supp. 507 (N.D.Ill.1985) (mere identity of clients not trade secret). Customer lists containing merely public information that could be easily compiled by third parties are not trade secrets. *Fireworks Spectacular, Inc. v. Premier Pyrotechnics, Inc.*, 86 F.Supp.2d 1102, 1106–07 (D.Kan.2000). Detailed records, however, regarding such information as purchasing patterns, sales volumes and payment histories may be a trade secret. *All West Pet Supply Co. v. Hill's Pet Prod. Div.*, 840 F.Supp. 1433, 1438 (D.Kan.1993). Based on plaintiffs' conclusory statements regarding this database, it is unclear what detail the database included. Further, plaintiffs' former salespeople testified that plaintiffs do not have trade secrets in their customer lists. Plaintiffs found these customers through standard methods, as discussed above. *See.* Testimony of Mary Kubitschek (Doc. # 665) at 5–6; Testimony of Byron Fry (Doc. # 679) at 246–47. The Court is unable to say that plaintiffs put forth so much time and effort, and compiled such detailed records that their customer list contains information which is not generally known or readily ascertainable.

Plaintiffs further fail to show that they took reasonable steps to protect the secrecy of any customer list. Byron Fry, one of the employees who helped build plaintiffs' customer base, testified that he never signed a confidentiality agreement and plaintiffs never told him that they considered their customer information to be a trade secret. Testimony of Byron Fry (Doc. # 679) at 247, 250. If plaintiffs considered their customer lists to be trade secrets, it was reasonable for them to inform their employees that such information was secret. *See Webster Engineering and Mfg. Co., Inc. v. Francis*, 1993 WL 406025 at *4 (D.Kan.1993). Plaintiffs produce employee handbooks from 1995 and 1996, and each mentions in one sentence that plaintiffs' customers are confidential. *See* Ex. 155 (1995 BioCore Employee Manual, at C003277); Ex. 156 (1996 BioCore Employee Manual, at C003298). The Court finds no other indication that plaintiffs suggested to their employees that any customer list was a trade secret. Based on Fry's statement that plaintiffs never told him that they considered customer lists to be trade secrets, the Court finds that the employee handbooks were insufficient to place plaintiffs' employees on notice that any customer list was a secret. Plaintiffs therefore fail to show that they took reasonable steps to protect the security of their customer list. Plaintiffs have failed to meet their burden of proving that their customer list is a trade secret.

Further, plaintiffs fail to meet their burden of proving that Khosrowshahi had access to any customer database, that he took this database with him when he left, and that he disclosed the customer list to

Integra. While plaintiffs suggest that Khosrowshahi had access to all of their documents, and that he took thousands of documents when he left, the record contains no evidence that the database could be (or was) reduced to document form. Even assuming that it was both reducible and reduced, the record does not suggest that Khosrowshahi disclosed any customer list to Integra or that he or Integra used the customer list. While plaintiffs produce evidence that Integra wanted Khosrowshahi to target existing collagen customers, this evidence does not allow an inference of disclosure because Integra never introduced a competing product into the marketplace. Even assuming that Khosrowshahi *would have* disclosed plaintiffs' customer list, the record quite simply suggests that he never did so because Integra never created a product which it could sell to plaintiffs' customers.

## 11. TAFA Sales

In their trial brief, plaintiffs allege that Khosrowshahi has been unjustly enriched because he obtained plaintiffs' products from Richard Walsh, a distributor for plaintiffs, and sold the product for approximately $100,000 to TAFA, another distributor of medical products. Plaintiffs are not entitled to any recovery on this claim. First, to avoid sanctions or other penalties based upon their destruction of the financial records on which they based their multi-million dollar damage claim, plaintiffs agreed not to pursue any theory that Khosrowshahi had disclosed trade secrets to Walsh. *See Minute Sheet* (Doc. # 547). Second, even if plaintiffs had not dropped this claim prior to trial, they did not object to jury instructions which limited plaintiffs' trade secret misappropriation claim to misappropriation in favor of Integra. *See Jury Instructions* (Doc. # 573); *Volume VI, Supplemental Transcript of Trial* (Doc. # 680) at 573–79. Plaintiffs cited the TAFA sales only to suggest that Khosrowshahi had a motive to disclose trade secrets to Integra. *See Volume III, Supplemental Transcript of Trial* (Doc. # 679) at 297–313. Plaintiffs are therefore barred

from raising such a claim in this trial. Further, even if plaintiffs had raised this claim in the first trial, the evidence simply does not support any misappropriation of specific trade secrets.

To the extent that plaintiffs allege that Khosrowshahi received the products from Walsh as a reward for disclosing trade secrets to Integra, this claim also fails. First, the Court has already found that Khosrowshahi did not disclose plaintiffs' trade secrets to Integra. Second, no credible evidence supports any connection between Walsh's actions and Khosrowshahi's employment with Integra.

## Conclusions of Law

### 1. Misappropriation of Trade Secrets

Based on the above discussion, the Court finds that plaintiffs have not met their burden of proving that Khosrowshahi misappropriated plaintiffs' trade secrets in violation of the KUTSA, K.S.A. 60–3320 *et seq.* Plaintiffs further fail to show any risk of future disclosure, since Integra abandoned its collagen wound care project no later than January of 1998.

This ruling is in direct contrast to the jury's finding that Khosrowshahi had misappropriated trade secrets and disclosed them to Integra. This ruling may *appear* to be inconsistent with the Court's prior finding that the jury verdict as to liability for misappropriation was supported by sufficient record evidence. In fact, however, this ruling is not inconsistent. In a trial to the Court, the Court must *independently* weigh the evidence and the credibility of witnesses. Having done so, it disagrees with the jury's conclusion that Khosrowshahi misappropriated trade secrets. To the extent that the Court and jury disagree whether particular items were trade secrets, the jury necessarily relied upon testimony of Jain, Radonjic and Maczuga—the only individuals who testified at length regarding the identity of plaintiffs' trade secrets. Having observed Jain throughout the course of the lengthy trial, and having scrutinized

his testimony at trial, the Court simply finds that Jain was not a credible witness. Except to the extent that this order may credit specific portions of his testimony, the Court rejects not just part but all of his testimony. As demonstrated through effective cross examination, Jain has spun a large and elaborate web of fraud which appears to infect every facet of his dealings with BioCore and BMT, his financial obligations to creditors of BioCore and BMT, and his liability for federal and state income taxes.[5] Moreover, except to the extent recited above, the Court has little use for the expert testimony of Radonjic and Maczuga—whose testimony aptly demonstrates the truth of the adage "garbage in-garbage out." In concluding what trade secrets plaintiffs possessed, both experts relied heavily on plaintiffs' documents and representations by Jain. Further, their testimony was extremely conclusory. While both claimed that plaintiffs had trade secrets, they merely listed broad areas, such as "processing parameters" or "customer lists." Neither expert went into detail regarding exactly what plaintiffs had or did that qualified as trade secrets. They did not provide specific examples of why plaintiffs' methods were any different than methods used by others. The Court therefore finds little credible evidence that plaintiffs possessed trade secrets.

In contrast with Jain's utter lack of credibility as a witness, Khosrowshahi did not lack credibility in denying any claim of misappropriation. His denial appeared both reasonable and credible, especially when combined with the lack of direct evidence of misappropriation.[6]

## 2. Misappropriation of Confidential Information

Plaintiffs argue that even if the Court finds that Khosrowshahi did not misappropriate trade secrets, plaintiffs can recover if the Court finds that Khosrowshahi misappropriated confidential information. Plaintiffs contend that confidential information is protected but requires a lower standard of proof than trade secrets. Any theoretical difference between confidential information and trade secrets is irrelevant, however, in this case. Plaintiffs' discovery responses stated that the only confidential information that Khosrowshahi misappropriated was also trade secret information. The Court therefore limited plaintiff's claim for misappropriation of confidential information to confidential information which constituted trade secrets. *See Minute Sheet* (Doc. # 493); *Volume VI. Supplemental Transcript of Trial* (Doc. # 680) at 574.

Further, plaintiff does not come forward with any Kansas case or statute that recognizes a cause of action for "misappropri-

**5.** In the Court's opinion, the cold transcript of Jain's cross examination does not fully reveal his apparent inability or unwillingness to tell the truth or his contempt for the truth-seeking function of the litigation process. When Jain testified on direct examination, he appeared self-assured; his answers came quickly and sounded reasonable. During cross examination, however, defense counsel repeatedly exposed situations in which Jain appeared in a less than honest light. Jain became frustrated and confrontational and his answers came much slower—creating an appearance that he was making them up as he went. As a result, many of his attempts to explain away these situations were laughable. For example, defense counsel showed that Jain had two different sets of tax returns—one for filing with the IRS and one for getting bank loans. Not surprisingly, the bank loan set claimed much

more income and many fewer liabilities than the tax liability set. Jain attempted to explain away this irregular method of proceeding, stating that he did not know whether the banks *relied* on the tax returns and that he never claimed to the banks that the tax returns which he gave them were his *real* tax returns. *See* Testimony of Manoj Jain, Volume III (Doc. # 663) at 491-506. It is obvious that Jain chose to provide false information to the IRS and/or the banks.

**6.** The Court does not suggest that Khosrowshahi's testimony on all subjects can be adopted without question. It simply finds that his testimony that he did not misappropriate plaintiffs' trade secrets is believable in light of the record evidence as a whole, and when compared to Jain's testimony.

**1238**

ation of confidential information." In fact, it appears that in terms of tort liability for misappropriation, Kansas courts do not distinguish trade secrets and confidential information. *See Wilkin v. Sunbeam Corp.*, 377 F.2d 344, 346 (10th Cir.1967) (applying trade secret elements to claim of "misappropriation of confidential information"); *Morrison v. Woodbury*, 105 Kan. 617, 185 P. 735, 737 (1919) (equating trade secret with confidential information); *see generally Southwestern Bell Telephone Co. v. State Corp. Commission*, 6 Kan.App.2d 444, 457, 629 P.2d 1174, 1184 (1981) ("For purposes of disclosure, any distinction between trade secrets and confidential commercial information would appear immaterial"). Even if confidential information can be something less than a trade secret, it must at least be a trade secret to give its owner a property right in it. *See Puritan–Bennett Corp. v. Richter*, 235 Kan. 251, 256, 679 P.2d 206, 211 (1984) (if knowledge does not qualify for protection as trade secret, court should not inhibit employee's ability to use knowledge to further career) (quoting *Great Lakes Carbon Corp. v. Koch Industries*, 497 F.Supp. 462, 471 (S.D.N.Y.1980)); *see also Koch v. Faulconer*, 227 Kan. at 831, 610 P.2d at 1107 (noting that former employees can only be enjoined from using customer lists when lists qualify as trade secrets). While Kansas might apply a lesser standard for confidential information in cases of fiduciary duty, that question is not before the Court because it has already dismissed plaintiff's claim for breach of fiduciary duty. The Court therefore finds that plaintiffs cannot recover on any claim for misappropriation of confidential information.

**IT IS THEREFORE ORDERED** that based on the above discussion, plaintiff is not entitled to any recovery on its claim that Khosrowshahi misappropriated its trade secrets. The Clerk is directed to enter judgment accordingly.